# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**UNITED STATES OF AMERICA AND THE STATE OF NEW JERSEY, ex rel. DAVID FREEDMAN,**

**Plaintiffs,**

v.

**BAYADA HOMES HEALTH CARE, INC. *et al.*,**

**Defendants.**

---

**Case No. 17–cv–06267–ESK–AMD**

**OPINION**

---

**KIEL, U.S.D.J.**

**THIS MATTER** is before the Court on the motion of plaintiff-relator David Freedman (Relator) for leave to file third amended complaint (Motion to Amend) (ECF No. 88).   For the following reasons, the Motion to Amend will be GRANTED.   Because I will grant the Motion to Amend, defendants BAYADA Home Health Care, Inc. and David Baiada's motion to dismiss (Motion to Dismiss) (ECF No. 68) will be DENIED as moot.

## BACKGROUND

BAYADA Home Health Care, Inc. ("BAYADA"), a national home health care company, is at the center of this case.   (Second amended complaint ("SAC"), ECF 16 ¶2.)   Relator alleges that BAYADA engaged in several schemes, including "claims for payment fraudulently tainted by kickbacks" as well as "illegal referral structures" induced by fraudulent statements.   (*Id.*)   The SAC describes multiple schemes between BAYADA and other entities, including some named defendants, using the alleged fraudulent practices.

Occurring in 2014, the first alleged scheme is between BAYADA and now-dismissed defendant Watermark Retirement Communities, Inc. (Watermark). (*Id.* ¶ 4.)   Watermark is a "national chain of retirement communities" and also operated a small home health company.   (*Id.*)   BAYADA purchased the assets of Watermark's home health company at a cost "way beyond the value of the assets acquired."   (*Id.* ¶ 5.)   As part of the joint venture, BAYADA agreed to refer patients to Watermark, and Watermark agreed to refer its residents to BAYADA.   (*Id.*)   In short, Relator alleges that BAYADA paid money to Watermark for Medicare-insured patient referrals.   (*Id.*)

In 2015 through 2016, BAYADA entered into a joint venture with Cape Regional Medical Center (Cape Regional) and Cape May County (County).   (*Id.* ¶ 6.)   BAYADA entered into the joint venture with Cape Regional using the County's Medicare agreement, provider number, billing privileges, New Jersey Certificate of Need, and New Jersey license.   (*Id.*)   "BAYADA provided all the services and billed Medicare using the County's provider number."   (*Id.*)   BAYADA misrepresented the County's role in the venture where the County was not actually involved, and falsified forms and applications so that the joint venture could accept Medicare.   (*Id.* ¶ 8.)   Cape Regional invested $350,000 and received a 50% ownership interest in the joint venture.   (*Id.* ¶ 7.)   Relator asserts that the "50% ownership to [Cape Regional] was an illegal payment of 'something of value' to induce referrals."   (*Id.*)

In 2016, BAYADA entered into a joint venture with Medical University of South Carolina (MUSC) and Medical University of South Carolina Strategic Ventures (MUSC SV).[1]   (*Id.* ¶ 9; proposed third amended complaint ("PTAC"), ECF No. 88–3 ¶ 14.)   MUSC SV invested $245,000 and promised referrals in

---

[1] Medical University South Carolina SV is not named as a defendant in the Second Amended Complaint but is proposed as a new defendant in the PTAC.

exchange for a 49% ownership interest in the joint venture.   (SAC, ECF No. 16 ¶ 9.)

Before BAYADA's involvement, from June 2010 through May 2016, Visiting Nurse Association of Central Jersey, Inc. (Visiting Nurse) entered into a joint venture with Cape Regional, similar to BAYADA's joint venture with Cape Regional.   (SAC, ECF No. 16 ¶ 13.)   The agreement between Visiting Nurses and Cape Regional also provided Cape Regional with a significant ownership interest of 50% in the joint venture, although Cape Regional's only role in the venture was to provide referrals.   (*Id.* ¶ 14.)   The joint venture also "misled the New Jersey Department of Health, the Medicare accrediting organization, and Medicare about the role of the County and of [Cape Regional]."   (*Id.* ¶ 15.)

In 2011, Visiting Nurses and Cape Regional also engaged in a hospice-joint-venture, pursuant to which Cape Regional "was illegally paid kickbacks for referrals," and again Visiting Nurses misrepresented the County's role to obtain status as a Medicare-approved provider.   (*Id.* ¶¶ 20, 21.)

Relator was employed by BAYADA, and "repeatedly objected to, reported, warned about[,] and tried to stop the fraudulent schemes."   (*Id.* ¶ 22.)   He alleges that he was retaliated against and was discharged for "his multiple attempts to report and stop" the illegal conduct.   (*Id.*)

## PROCEDURAL HISTORY

This case is a *qui tam* action brought by Relator alleging violations of the False Claims Act (FCA).   On August 18, 2017, Relator filed his initial complaint under seal.   (ECF No. 1.)   On June 6, 2018, Relator filed a notice to administratively reopen case for limited purpose of filing an amended complaint.   (ECF No. 3.)   The notice advised that the matter had been administratively terminated on October 31, 2017.   (ECF No. 3 p. 2.)   The

docket does not reflect that this case had been administratively terminated during that period.

Also on June 6, 2018, Relator filed a first amended complaint. (ECF No. 2.)   On June 18, 2018, this Court issued an order staying and administratively terminating the action.   (ECF No. 4.)

On January 26, 2021, the United States filed a motion for an order restoring matter to the active docket, lifting the stay and extending time. (ECF No. 5.)   The Court granted the motion on the same day.   (ECF No. 6.) On January 29, 2021, Relator filed a motion for leave to file a second amended complaint (ECF No. 9), which was granted on June 25, 2021 (ECF No. 15).   The SAC was filed on June 30, 2021.   (ECF No. 16.)

On September 8, 2021, the United States filed a notice of election to intervene in part for settlement purposes and to decline in part.   (ECF No. 19.) On September 27, 2021, the United States and Relator filed a joint stipulation of dismissal, advising that a settlement was reached with defendants BAYADA, BAYADA Health, LLC, and BAYADA Home Care. (ECF No. 20 ¶2.) Accordingly, the United States and Relator stipulated to dismissal of claims against these defendants. (*Id.* ¶4.)   The United States and Relator also stipulated to dismissal of claims against David Baiada, J. Mark Baiada, Tri-County Home Health and Hospice, LLC, Cape Regional Home Health Care LLC, and SCHHA LLC d/b/a MUSC Health at Home, by Bayada.   (*Id.* ¶5.)

On February 8, 2022, the United States filed a motion for extension of time until August 22, 2022, to determine whether to intervene.   (ECF No. 21.)   The Court granted the extension.   (ECF No. 22.).   On August 16, 2022, the United States filed a motion for extension of time until February 22, 2023, to determine whether to intervene.   (ECF No. 23.)   The Court granted the extension. (ECF No. 24.)   On February 22, 2023, the United States filed another motion for extension of time, seeking an extension until August 23, 2023 to determine

whether to intervene.   (ECF No. 28.)   Instead of the six months requested, the Court granted a three-month extension.   (ECF No. 32.)   On May 19, 2023, the United States filed a final motion for extension of time, seeking an extension until August 21, 2023.   (ECF No. 34.)   The Court granted the extension. (ECF No. 35.)

On August 15, 2023, the United States filed a notice of election to intervene in part for settlement purposes and to decline in part and request unsealing of *qui tam* complaint.   (ECF No. 37.)   On August 31, 2023, the Court lifted the seal on certain documents, specifically both notices of election to intervene filed, the SAC, and all documents filed after the date of the Court's unsealing Order.   (ECF No. 40.)

On October 9, 2023, Relator filed a notice of voluntary dismissal, dismissing claims for expenses and for attorneys' fees and costs against Watermark.   (ECF No. 47.)   On November 9, 2023, the United States and Relator filed a joint stipulation of dismissal advising of a settlement with Watermark.   (ECF No. 66 ¶ 2.)

On September 29, 2023, Relator filed waiver of service on behalf of BAYADA (ECF No. 45) and David Baiada (ECF No. 46.)   On October 9, 2023, Relator filed a waiver of service on behalf of Cape Regional (ECF No. 48) and MUSC (ECF No. 49).   On October 17, 2023, Relator filed a waiver of service on behalf of Cape Visiting Nurse Association, Inc. (ECF No. 52), Visiting Nurse (ECF No. 53), and the County (ECF No. 54).

On November 13, 2023, BAYADA and David Baiada (collectively, "BAYADA Defendants") filed the Motion to Dismiss.   (ECF No. 68.)   Then on November 29, 2023, Relator filed the Motion to Amend.   (ECF No. 88.)   On December 19, 2023, Relator filed a response to the Motion to Dismiss.   (ECF No. 96.)   The parties then sought, and the Court granted, a stay on any further

briefing on the Motion to Dismiss pending resolution of the Motion to Amend. (ECF Nos. 98, 99.)

On January 12, 2024, the BAYADA Defendants, Cape Regional, and MUSC filed oppositions to the Motion to Amend.   (ECF Nos. 106 to 112.)   In addition, defendants Visiting Nurse and Cape Visiting Nurse Association, Inc. (collectively, Visiting Nurse Defendants) filed a letter joining in Cape Regional's opposition.   (ECF No. 113.)   On January 26, 2023, Relator filed replies to the oppositions of the BAYADA Defendants and MUSC to the Motion to Amend. (ECF Nos. 119, 120.)   On January 29, 2024, the United States filed a letter statement of interest, which did not take a position on the Motion to Amend, but "correct[ed] factual and legal errors in the submissions by Cape Regional and MUSC."   (ECF No. 112 (citations omitted).)

Relator presents three primary arguments why leave to file the PTAC should be granted: (1) "to address[] issues raised in the Motion to Dismiss"; (2) remove defendants and claims following settlements; and (3) replace a defendant that is immune from the claims with the proper corporate entity. (ECF No. 88 ¶¶ 10, 11.)

## LEGAL STANDARD

Leave to amend pleadings shall be "freely give[n]" when "justice so requires." Fed. R. Civ. P. 15(a)(2).   This decision is committed to the sound discretion of the court. *Arab African Int'l Bank v. Epstein*, 10 F.3d 168, 174 (3d Cir. 1993).   Federal Rule of Civil Procedure (Rule) 15 "embodies a liberal approach to pleading." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 202 (3d Cir. 2006).   In the absence of unfair prejudice, futility of amendment, undue delay, bad faith, or dilatory motive, the court must grant leave to amend. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).   The court may also ground its decision "on consideration of additional equities, such as judicial economy/burden on the

court and the prejudice denying leave to amend would cause to the plaintiff." *Mullin v. Balicki*, 875 F.3d 140, 149–50 (3d Cir. 2017).

"The mere passage of time does not require denial of a motion to amend on grounds of delay." *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001) (citing *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)). However, "at some point the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* (quoting *Adams*, 739 F.2d at 868). Additional factors the Court may consider in determining whether a delay is undue include if the movant has had previous opportunities to file an amended complaint, the stage of the litigation, and interests of judicial economy and finality of litigation. *Id.*

"[S]ubstantial or undue prejudice to the non-moving party is a sufficient ground for denial of leave to amend." *Id.* (citing *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993)). "In determining whether amendment of a complaint will cause undue prejudice, the Court must 'focus on the hardship to the defendants if the amendment were permitted.'" *Stolinski v. Pennypacker*, No. 07-3174, 2011 WL 13238545, at *6 (D.N.J. June 23, 2011) (citing *Cureton*, 252 F.3d at 273). Consequently, undue prejudice suffices to deny leave to amend where, "if amendment were permitted, the [defendant] would be prejudiced by having to engage in burdensome new discovery and significant new trial preparation." *Cureton*, 252 F.3d at 273–74 (finding no abuse of discretion in denying motion to amend where the district court determined that the "proposed amendment would essentially force the [defendant] to begin litigating this case again.").

However, "incidental prejudice to the opponent is not a sufficient basis for denial of an amendment; such prejudice becomes 'undue' when the opponent shows it would be 'unfairly disadvantaged or deprived of the opportunity to

present facts or evidence which it would have offered.'" *Faiella v. Sunbelt Rentals, Inc.*, No. 18-11383, 2019 WL 3557714, at *3 (D.N.J. Aug. 5, 2019) (citing *Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990) (citing *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir. 1981) (denying in part a motion to amend to add affirmative defenses where discovery was complete and amendment would cause discovery to be reopened and a trial to be postponed))).

An amendment would be futile if the complaint, as amended, advances a claim or defense that "would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). The Court applies the Rule 12(b)(6) standard when evaluating futility. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010) (citing *Shane*, 213 F.3d at 115). A pleading is sufficient to pass a Rule 12(b)(6) review if it contains enough factual allegations which, accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ANALYSIS

### I.   SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

### II.   FUTILITY

Each defendant argues that the Motion to Amend should be denied because the proposed amendment would be futile. I will first address Cape Regional's argument, joined by the Visiting Nurse Defendants, that the Motion to Amend should be denied because the United States failed to comply with

procedural requirements of the FCA.   Next, I will address Cape Regional's argument, joined by the Visiting Nurse Defendants, that the proposed amendment is futile because the claims are barred by the applicable statute of limitations.   Finally, I will address each defendant's argument that the proposed amendment is futile because the claims are meritless.

### A.   Procedural Requirements (Cape Regional and Visiting Nurse Defendants)

#### 1.   Failure to Seek Extension

Cape Regional claims that the PTAC fails to state a claim upon which relief can be granted because "the Government and the Relator failed to comply with 31 U.S.C. §§3730(b)(3) & (4)."   (ECF No. 111 p.12.)   Relator responds that "[n]either this Court's actions or decisions, nor the actions or delay during the [G]overnment's investigation, constitute grounds for denying leave to amend, much less dismissing the FCA complaint."   (ECF No. 120 p.11.)

31 U.S.C. §3730(b) sets out the procedures related to sealing and service for claims under the FCA:

> (2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure.   The complaint shall be filed *in camera*, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.   The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

> (3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2).   Any such motions may be supported by affidavits or other submissions *in camera*. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and

served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall--

> (A) proceed with the action, in which case the action shall be conducted by the Government; or

> (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

31 U.S.C. § 3730(b)(2)–(4).

Cape Regional argues that "[b]ecause the Government did not seek to extend the seal before 2021, the Court did not enter any order extending the seal. Accordingly, under the plain language of §§ 3730(b)(3) & (4), Cape Regional (and all other defendants) should have been served 'pursuant to [Rule] 4' within 120 days after October 17, 2017. Thus, under Rule 4, Relator was required to serve Cape Regional no later than February 14, 2018." (ECF No. 111 p. 13.) Further, Cape Regional states that even where seal extension requests are filed, "repeated extensions 'can amount to significant abuses of the statutory scheme.'" (Id. (citation omitted).) Cape Regional argues that this is a basis for dismissal because "[j]ust like any case, the remedy for failure to timely serve is dismissal." (Id. p. 14.) Cape Regional concedes, however, that to its knowledge, "no Court of Appeals has yet considered the appropriate remedy in circumstances such as these, i.e., cases in which the [G]overnment requests that a *qui tam* action remain under seal indefinitely without proffering any good cause for that request." (Id.)

There are two threshold questions to address: (1) whether an "administrative termination" rather than an extension of time for the

Government to decide whether to intervene violated the FCA's procedural requirements, and (2) whether the Government presented sufficient "good cause" to support its subsequent extension requests.

Cape Regional's argument that the Government failed to comply with 31 U.S.C. §3730(b)(3) and (4) ignores language related to service of the complaint in 31 U.S.C. §3730(b)(2), which provide that "[t]he complaint shall be filed *in camera*, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders."   This language is important for two reasons.   First, the requirement that the complaint shall remain under seal for at least 60 days acknowledges that the process the Government undertakes in assessing its potential involvement in the *qui tam* action may take longer than 60 days.   This is reinforced by the language in 31 U.S.C. §3730(b)(3) permitting extensions of this time.   Second, §3730(b)(2) directs that the relator not serve the complaint on defendants until the Court enters an order permitting service.   Thus, Cape Regional's argument that it should have been served no later than February 14, 2018 is refuted because the Court had yet to order service at that time.   The Court did not order service upon defendants until August 31, 2023.   (ECF No. 40.)   Relator complied with the statutory scheme by waiting for the Court's order to serve defendants.

## 2.   <u>Administrative Termination</u>

Next, I will address Cape Regional's argument that the administrative termination violates the FCA by delaying proceedings without an extension request and showing of good cause.   Cape Regional asserts that there was no extension requested nor granted until 2021, because from the filing of the initial complaint until January 2021 the case was administratively terminated. (ECF No. 111 p.13.)   It alleges that this violates the FCA's sealing and service provisions.   (Id.)

Cape Regional does not point to any caselaw in support of its argument. The purpose of an administrative termination, or administrative closing as it is referred to in other districts, is to "shelve pending, but dormant, cases." *Penn W. Assocs., Inc. v. Cohen*, 371 F.3d 118, 127 (3d Cir. 2004) (quoting *Lehman v. Revolution Portfolio LLC*, 166 F.3d 389, 392 (1st Cir. 1999)).   It is a tool used by the district court to "manage its docket." *Id.* at 128.   In addition, this case was administratively terminated and stayed.   (ECF No. 4.)   This is different from cases where the case is only administratively terminated.   The addition of a stay demonstrates the Court's intention to proceed with the matter at the appropriate time and not to dispose of the case permanently.   Further, the administrative termination here had essentially the same effect as an extension request, allowing the Government to continue its investigation and determine whether to intervene while the case remained sealed.

While this mechanism is not contemplated in the FCA, it aligns with the spirit of the statute.   The FCA permits extensions recognizing that investigations into *qui tam* claims can take longer than the initial 60-day sealing period.   There were approximately three years from the filing of the initial complaint until the administrative termination was lifted.   The Court could have extended the seal for that period.   *See, e.g., United States ex rel. Charte v. Am. Tutor, Inc.*, 934 F.3d 346, 348 (3d Cir. 2019) ("The *qui tam* action remained under seal for over seven years, as the Government considered whether to intervene."); *Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766, 767 (E.D. Pa. 2001) ("After granting the Government a series of extensions for some three years and with still no election to intervene, the court determined that further delay was unwarranted."); *United States ex rel. Brasher v. Pentec Health, Inc.*, 338 F. Supp. 3d 396, 404 (E.D. Pa. 2018) (granting ten extension requests and keeping the case under seal for five years before denying the eleventh request); *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 442

(W.D. Pa. 2012) ("The case remained under seal for over four years, while the United States evaluated whether or not to intervene.").   The Court permitted the case to be administratively terminated based on the Government's need for additional time to decide whether to intervene.   This delay does not provide a basis for dismissal and, as such, does not render the proposed amendment futile.

In engaging in this analysis, I do not ignore a detail that Cape Regional did not raise but is mentioned in MUSC SV's brief—the docket does not reflect an administrative termination prior to June 18, 2018.   Although there is a notice to administratively reopen filed on June 5, 2018 that states that the case had been stayed and administratively terminated pursuant to a October 31, 2017 request, there is no request, stay, or administrative termination on the docket from 2017.   While it may be that in the absence of a stay, administrative termination, or seal extension, the case should have been unsealed and this Court should have ordered Realtor to serve defendants.   However, the case remained sealed.   Thus, Relator was not permitted to serve defendants during this period.

### 3.   <u>Remedy for Repeated Extensions</u>

Finally, I address Cape Regional's argument that there was not good cause for the Court to grant the extensions.   Cape Regional argues that "repeated extensions 'can amount to significant abuses of the statutory scheme.'"   (ECF No. 111 p. 13 (quoting *United States ex rel. Brasher v. Pentec Health, Inc.*, 338 F. Supp. 3d 396, 401 (E.D. Pa. 2018)).   This citation to dicta does not provide a basis to deny the Motion to Amend because the Court considered the Government's extension requests and determined that good cause justified continuation of the seal.   As such, the extensions do not provide a basis for dismissal and, accordingly, do not render the proposed amendment futile.

13

Moreover, even if I were to determine that the period this case was sealed was too long or that the extension requests were not supported by good cause, the remedy under the circumstances would not be dismissal.   Cape Regional does not cite to any case where the granting of extensions resulted in dismissal. While a failure to timely serve may result in dismissal, under the FCA, Realtor was not permitted to serve until the case was unsealed and upon Court order. Thus, dismissal would not be the appropriate remedy here.

Cape Regional argues that the holding in *State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 580 U.S. 26 (2016) supports dismissal.   However, in *Rigsby*, the relator's counsel violated the seal by emailing a sealed-filing to journalists. *Id.* at 31.   In *Rigsby* the Supreme Court determined that dismissal was not a mandatory remedy for this violation but was permissible relief at the discretion of the district court.   *Id.* at 33–37.   Here, Relator did not violate the seal order. Cape Regional's argument that the seal provision of the FCA was violated by not using the appropriate mechanism to effectuate the seal order is not analogous to a violation of a seal that is in place.

Cape Regional also cites to *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727 (5th Cir. 2023), *cert. denied sub nom. Corp. Mgmt. v. U.S., ex rel. Aldridge*, No. 23-546, 2024 WL 218799 (U.S. Jan. 22, 2024).   While *Corporate Management* involved numerous extensions of the seal, the Court found that dismissal was not the appropriate remedy.   *Id.* at 747 ("Irrespective of the FCA's provisions requiring dismissal of claims in certain instances, '[t]he authority of a federal [] court to dismiss a plaintiff's action with prejudice because of [its] failure to prosecute cannot seriously be doubted.'   But the district court here declined to exercise that authority, and [a]ppellants fail to pinpoint when the court's cumulative indulgence of the Government's snail's pace rose to an abuse of discretion.") (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 629 (1962) (alterations in original).   Instead, the Court noted that

"[a]ppellants provide no precedent, and we are aware of none, where such an extraordinary sanction as dismissal has been awarded because of the Government's inexcusable delays in intervening in a relator's case."  *Id.*

*Corporate Management* is also distinguishable because in that case the movant sought only dismissal of "the Government's complaint in intervention, allowing the relator to proceed on his original compliant if he so chooses."  *Id.* Here, the Government has declined to intervene, therefore, Cape Regional seeks dismissal of Relator's complaint as a remedy for the Government's alleged delay.  *Corporate Management* does not support dismissal in this case.

### 4.    <u>Request to Certify</u>

Cape Regional requests certification for appeal.  (ECF No. 111 p. 18.)  It argues that this is a novel issue, as "no Circuit Court has yet ruled on the proper remedy where the [G[overnment completely abdicates its responsibility to make any seal extension requests over a number of years, during which time the case nonetheless remains under seal."  (Id.)  Cape Regional concludes that "[a] favorable decision for [d]efendants would effectively terminate this case, and even a decision that merely clarified the proper remedy for these seal and service violations would obviate the need for additional briefing at the motion to dismiss and summary judgment stage, when these same issues are certain to arise."  (Id. p. 19.)

A party may pursue an interlocutory appeal "only when: (1) the order involves a controlling question of law; (2) as to which there is a substantial ground for a difference of opinion; and (3) the final resolution of the appeal has the potential to materially advance the determination of the litigation."  *Juice Ent., LLC v. Live Nation Ent., Inc.*, 353 F. Supp. 3d 309, 311 (D.N.J. 2018) (citing 28 U.S.C. § 1292(b) and *Tristani ex rel. Karnes v. Richman*, 652 F.3d 360, 365 (3d Cir. 2011)).  All three requirements must be met before an issue may be certified for appeal.  *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d

698, 709 (D.N.J. Mar. 19, 2013) (citing *In re Schering–Plough Corp.*, No. 8-397, 2010 WL 2546054, at *4 (D.N.J. June 21, 2010)).    The movant bears the burden of demonstrating that each requirement is met.  *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 633 (D.N.J. Apr. 7, 2014).

Deferral of appellate review until entry of final judgment "is a basic tenet of federal law."    *Juice Ent., LLC*, 353 F. Supp. 3d at 311–12 (quoting *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996)).    Certification therefore "should only rarely be allowed as it deviates from the strong policy against piecemeal litigation,"    *Wyndham Worldwide Corp.*, 10 F. Supp. 3d at 633 (quoting *Huber v. Howmedica Osteonics Corp.*, No. 07–2400, 2009 WL 2998160, at *1 (D.N.J. Mar. 10, 2009)).    A court's certification decision is "wholly discretionary," and a court may deny certification even when the three prongs is met.  *See Juice Ent., LLC*, 353 F. Supp. 3d at 312 (quoting *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 161 F. Supp. 2d 355, 358 (D.N.J. Aug. 24, 2001)); *Weske*, 934 F. Supp. 2d at 709; *see also United States v. Riddick*, 669 F. App'x 613, 613 n.2 (3d Cir. 2016) (citing *Forsyth v. Kleindienst*, 599 F.2d 1203, 1208 (3d Cir. 1979)) (finding that an order denying a request to certify questions for appeal was unreviewable).

The Third Circuit has not issued a decision analyzing the appropriate remedy for district courts to apply when a *qui tam* case has remained under seal beyond the 60-day period.    However, I conclude there is no substantial ground for difference of opinion that dismissal of a complaint is not an appropriate remedy under the circumstances presented here.    The request to certify is denied.

### B.    Statute of Limitations (Cape Regional)

Cape Regional argues that the proposed amendment is futile because the case is barred by the statute of limitations.    Actions under the FCA must be brought either within six years of the date on which the violation occurred, or

16

within three years of "the date when facts material to the right of action are known or reasonably should have been known … but in no event more than 10 years after the date on which the violation is committed."  31 U.S.C. §3731(b).

Cape Regional asserts that the statute of limitations was not tolled during the period the case was administratively terminated.  Accordingly, applying the three-year-statutory limitations period, Cape Regional states that "[e]ven if the Government did not learn about the conduct alleged here until the day of the filing of the original complaint, the deadline to assert those claims would have expired over three years ago, on August 18, 2020, and any allegations filed after that point should be time barred."  (ECF No. 111 p.20.)  Cape Regional does not address whether any of the allegations in any version of the complaint—the original, amended complaint, SAC, or the PTAC—include any allegations of violations within six years of the filing.

Relator disputes Cape Regional's position that the statute of limitations period continued to run while the case was administratively terminated.  He also argues that there are allegations of violations against Cape Regional that would fall within the statute of limitations, even if the time were not tolled until the SAC was filed on June 30, 2021, which was after the case was no longer in administrative termination status.  (ECF No. 120 p.15.)

Granting a motion to dismiss based on the statute of limitations is only appropriate where the bar is apparent on the face of the pleading.  *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).  Thus, I apply the Rule 12(b)(6) same standard in determining whether the proposed amendment would be futile.  *See Travelers Indent. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 243 (3d Cir. 2010).

Courts in this district have determined, on a case-by-case basis, whether an administrative termination tolls the statute of limitations.  Although no bright-line-rule has been established, this question only relates to defendants

that are added through an amended complaint after the administrative termination.  *See Baglione v. Clara Maass Med. Ctr., Inc.*, No. 99-4069, 2006 WL 2591119, at *4, 5 (D.N.J. Sept. 8, 2006) (discussing cases).   Here, so long as the allegations in the complaints filed after the administrative termination relate back to the original complaint, there is no statute of limitation question.

Cape Regional was named in the original complaint, and does not make any argument that the allegations in the PTAC do not relate back to the claims in earlier complaints.   Rather, Cape Regional treats the SAC, filed approximately five months after the administrative termination ended and the case was restored to the active docket, as the filing from which it calculates the statute of limitations.   None of the cases discussing whether administrative termination tolls the statute of limitations that I am aware of takes this position.   Instead, as explained, those decisions only question whether there is a statute of limitations bar against proposed new defendants.   *See id.*

Moreover, even if there are allegations that fall outside of the statute of limitations, there are also alleged violations that fall within the six-year statute of limitations.   For example, the PTAC includes allegations surrounding a joint venture between BAYADA and Cape Regional beginning in 2015 through 2016.   (PTAC, ECF No. 88-3 ¶11.)   These allegations were also in the SAC.   (SAC, ECF 16 ¶6.)   Thus, the allegations in the PTAC relate back at least to the SAC.   The SAC was filed in January 2021, less than six years after that joint venture was alleged to have occurred.   As there are allegations of violations involving Cape Regional that fall with the statute of limitations, I will not deny the Motion to Amend as futile based on the statute of limitations.

C.   <u>Meritless</u>

1.   <u>Cape Regional, Joined by Visiting
Nurse Defendants</u>

The PTAC includes six counts against Cape Regional, including claims brought under the FCA and the New Jersey False Claims Act.   Three of these counts are also brought against the Visiting Nurse Defendants, who have joined in Cape Regional's opposition to the Motion to Amend.

Cape Regional argues that the substantive claims in the PTAC are meritless.   First, Cape Regional asserts that plaintiff has failed to sufficiently plead the materiality requirement for an FCA violation, as "the Government continued to accept the Cape Regional's joint venture claims for payments for the entire period that the case was under seal.   In fact, the Government has never stopped paying those claims even after it became aware of Relator's allegations.   Accordingly, the Government's actual knowledge of the alleged misrepresentations had no effect whatsoever on its payment decisions."   (ECF No. 111 pp. 21, 22.)

"A [FCA] violation includes four elements: falsity, causation, knowledge, and materiality."   *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).   The Supreme Court has explained that "when evaluating materiality under the FCA, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."   *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 (2016).   Therefore, the Government's alleged continued payment here does not resolve the question of materiality as Cape Regional urges.   I note that "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material"; however, it is not enough for dismissal at this stage.   *Id.*

19

Second, Cape Regional asserts that "the Government has declined to intervene or take any action against Cape Regional." (ECF No. 111 p.22.) Cape Regional concludes that "Relator does not have any plausible theory as to why the supposedly false statements Cape Regional made mattered at all to the Government's decision to pay claim reimbursements." (*Id.*) Similar to accepting claims, while declination of intervention is relevant to the materiality argument, it is not dispositive. *United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Fairfield Co.*, 5 F.4th 315, 346 (3d Cir. 2021) ("intervention decisions are, at best, of minimal relevance … '[i]f relators' ability to [meet] the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the Act'") (alteration in original; citation omitted).

Accordingly, the proposed amendment is not futile based on a lack of materiality with respect to claims against Cape Regional.

### 2.   MUSC SV

Substituting the presently named defendants MUSC for MUSC SV, the PTAC alleges two counts against MUSC SV; false claims under the FCA and conspiracy under the FCA. MUSC asserts that these claims are insufficiently pleaded pursuant to the heightened pleading standard for fraud and, more specifically, that the PTAC fails to sufficiently allege both the materiality and knowledge requirements.

#### i.   Rule 9(b)

MUSC asserts that claims under the FCA and anti-kickback statute are subject to the heightened pleading requirement of Rule 9(b). (ECF No. 112 pp.17, 18.) MUSC states that "the [PTAC] fails to identify a single claim let alone describe the particulars of any claims submitted by MUSC [SV] to a government program. Instead, Relator simply assumes that the entity must have submitted claims." (*Id.* p.18.)

Although other circuits require pleading "'representative samples' of the alleged fraudulent conduct," the Third Circuit has explicitly held that a "more nuanced" approach satisfies the pleading requirements of Rule 9(b). *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155–57 (3d Cir. 2014). The Third Circuit explained that "it is sufficient for a plaintiff to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* at 156 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir.2009)).

The PTAC alleges that BAYADA and MUSC SV "created a joint venture home health agency." (PTAC, ECF No. 88-3 ¶ 14.) Relator alleges that "[e]ven though BAYADA was to provide all of the services, it gave [MUSC SV] a 49% ownership interest in the joint venture. All that [MUSC SV] provided in return was $245,000 in capital, plus arranging for MUSC's referrals." (*Id.*) Further, Relator alleges that "it is clear, both from the economics of the arrangement and from the written communications, that BAYADA's intent in offering MSC the 49% ownership interest ('something of value') was in exchange for arranging for referrals facilitated by MUSC." (*Id.* ¶ 15.) Relator alleges that "[a] very high percentage of the joint venture's home health billings were to come from patients referred by MUSC. Thus, the claims submitted to Medicare on account of home health services provided to those patients were tainted by [anti-kickback statute] violations and, therefore, false under the FCA." (*Id.* ¶ 16.)

Relator details communications between MUSC SV and BAYADA that demonstrate MUSC SV's role in the scheme. (*See id.* ¶ 159 ("MUSC was willing to provide referrals in return for [MUSC SV] to obtain a share of the ownership and profit of the new joint venture. The parties' intent is evidenced in part through a series of emails in August 2016 and in a commitment letter dated August 10, 2016 from Greg Bellomy of BAYADA to Patrick J. Cawley

M.D., M.B.A., Executive Director/CEO Medical Center and VP for Clinical Operations, CEO, MUSC Health (also known as MUSC [SV]), and Vice President for Health Affairs, MUSC."), *see id.* ¶ 161 ("The August 10, 2016 commitment letter to Dr. Cawley outlined the prospective financial benefits of the joint venture, including a pro-forma budget for the new entity that was premised on MUSC's referrals of patients to the joint venture.   In Exhibit 1 to the August 10, 2016 commitment letter, BAYADA projected revenue of $2,669,373 in year one (2017), $4,408,930 in year two (2018), and $4,973,128 in year three (2019).   The offering of a 49% interest to MUSC MSV, its right to make a profit as a co-owner, and an infinite return on investment after year three (when all start-up capital will have been returned to [MUSC SV]), only happened because MUSC has the ability to deliver referrals from its hospital system to the newly formed joint venture home health agency.")).

This scheme is plead with sufficient specificity, and as such that the proposed amendment is not futile based on failure to meet the Rule 9(b) pleading standard.

ii.   <u>Materiality</u>

MUSC argues that the PTAC fails to allege materiality.   MUSC explains that where the Government pays a claim "despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."   (ECF No. 112 p. 18 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016)).   Accordingly, MUSC argues that "Relator fails to allege that the [G]overnment has ever refused to pay a claim for payment from the joint venture entity at issue."   (*Id.*)

The PTAC alleges that, "[t]he Government would not, and in fact could not, have paid the claims if the Government knew that the Medicare claims that BAYADA caused to be submitted for the joint venture starting in January 2017

and continuing to the present were and continue to be false, or that the underlying contracts were induced by fraudulent financial projections, and the promise of illegal remuneration kickbacks to induce referrals in violation of the [anti-kickback statute]." (PTAC, ECF 88-3 ¶178). Moreover, as explained above, the Government's payment is not dispositive with respect to the question of materiality. *See Universal Health Servs., Inc.*, 579 U.S. at 195.

iii.  <u>Knowledge</u>

MUSC asserts that "the PTAC does not plead facts sufficient to support a claim that MUSC [SV] knowingly violated the anti-kickback statute by knowingly and willfully receiving remuneration in exchange for referrals for federally reimbursable services." (ECF No. 112 pp. 18, 19.) In further support, MUSC avers that "Relator fails to plead any inside information as to the actual consummation of any deal involving MUSC [SV], and in fact could not, as by his own allegations he left Bayada in August 2016 and the joint venture was not 'formalized' (i.e. agreed) until months later." (ECF No. 112 p. 19.)

Relator does allege that MUSC SV knowingly violated the anti-kickback statute, alleging that "[g]iven the projected size and revenue of the joint venture, a mere $245,000 capital contribution did not justify a 49% ownership interest. Instead, it is clear, both from the economics of the arrangement and from the written communications, that BAYADA's intent in offering MUSC SV the 49% ownership interest ('something of value') was in exchange for arranging for referrals facilitated by MUSC." (PTAC, ECF No. 88–3 ¶15.) Accepting the allegations in the PTAC as true, this is sufficient to plead knowledge such that the proposed amendment is not futile.

D.  <b><u>Bayada Defendants</u></b>

The PTAC includes five counts against the BAYADA Defendants: (1) retaliation in violation of the FCA; (2) violation of the New Jersey Conscientious

23

Employee Protection Act (CEPA); (3) breach of contract and the implied covenant of good faith and fair dealing; (4) unjust enrichment; and (5) promissory estoppel.

BAYADA makes a number of arguments as to why Relator fails to state a claim under the FCA and CEPA, including that: (1) the PTAC has failed to allege whistleblower activity required under CEPA; (2) the PTAC fails to plead a CEPA claim with sufficient specificity required under Rule 9(b); (3) Relator pleads conduct that does not constitute an adverse employment action under the FCA or retaliatory action under CEPA; (4) allegations related to MUSC and Inspira Health Network ("Inspira") were not directed at exposing or deterring an FCA violation; (5) the PTAC fails to plead causation; and (6) the PTAC does not establish that BAYADA's reason for Relator's termination was pretextual.

Relator argues that the SAC states sufficient claims to withstand a motion to dismiss; however, "to eliminate any doubt about the sufficiency of his pleadings, Relator filed the Motion to Amend to, *inter alia*, add facts strengthening the individual employment claims he asserts against [d]efendants." (ECF No. 119 p.5.)

## 1.   FCA and CEPA

A "[FCA] violation includes four elements: falsity, causation, knowledge, and materiality." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).   "A plaintiff who brings a cause of action [under CEPA] must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19–3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003).

### 2. Whistleblower Activity for CEPA Claims

The BAYADA Defendants allege that none of the statements alleged in the PTAC constitute whistleblower activity. (ECF No. 106 p. 18.) The BAYADA Defendants explain that "[n]owhere in the [SAC] does Relator allege that he told [Greg] Bellomy [then BAYADA Senior Living Division Director] that he believed Bellomy's projections violated a law, rule, or regulation or that they were fraudulent or criminal." (ECF No. 106 p. 18.) The BAYADA Defendants conclude that "[a]s a result, Relator fails to state a CEPA claim based on his questions and statements to Bellomy regarding the MUSC [joint venture]." (ECF No. 106 p. 19.)

Relator responds that there are no "magic words" required to trigger CEPA. (ECF No. 119 p. 7.) He argues that he did not need to "specifically use the word 'fraudulent' or tell his supervisor, Greg Bellomy [], what law, rule, or regulation the projections violated." (*Id.*) Rather, Relator argues that "a CEPA plaintiff is only required to show evidence from which a jury could conclude his employer was 'aware' of his concerns, even if he did not articulate an exact violation of a law, rule, or regulation." (*Id.* (citing *Hernandez v. Montville Tp. Bd. Of Educ.*, 354 N.J. Super. 467, 474 (App. Div. 2002)). Relator argues that he "repeatedly warned Bellomy that BAYADA's financial projections to MUSC, an investor and client in its joint venture, were fraudulent." (*Id.* p. 8.) Relator points to an email that he had sent "stating he did not want Bellomy to 'be upset' or see him as 'not being a team player,' but that the market data [Relator] provided showed that the revenue projections Bayada gave MUSC were 'unattainable.'" (*Id.*) In the email, he further stated that "Bayada needed to '*budget accurately.*'" (*Id.* (emphasis in original).)

Relator has sufficiently pleaded whistleblower activity such that the proposed amendment is not futile. In the PTAC, Relator added an allegation

that was not included in the SAC, explicitly stating that Relator "objected to BAYADA defrauding MUSC.   On August 7, 2015, [Relator] e-mailed [] Bellomy that the financial projections BAYADA intended to submit to MUSC 'don't make sense to me' and stated that the numbers were '[t]oo much, too fast.'" (ECF No. 88–3 ¶ 163.)   In addition, Relator alleges that on August 10, 2016 he "questioned [] Bellomy on whether MUSC's doctors and discharge planners would stop referring patients to established competitors and whether his financial projections were realistic." (*Id.* ¶ 164.)   Relator alleges that on August 12, 2016, he emailed Bellomy with market data that demonstrated that "the projections showed revenue that was more than two-times higher than the revenue BAYADA generated in similar ventures in established markets." (*Id.* ¶ 165.)   Relator alleges that then on August 18, 2016, he "e-mailed [] Bellomy warning him to '[b]e careful' because an appraiser would be doing its own financial projections for the MUSC deal, which would be 'substantially different.'" (ECF No. ¶ 167.)

Under CEPA, an employee engages in whistleblower activity where he:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care

N.J. Stat. Ann. § 34:19-3.

While the BAYADA Defendants argue that "Relator's allegations merely suggest that he did not understand or agree with BAYADA's projections, not

26

that he told Bellomy or anyone else at BAYADA that the projections were fraudulent" (ECF No. 106 p. 18), the warning to "be careful" and that another appraiser's results would be substantially different may suggest more than mere misunderstanding or disagreement.   Viewing the allegations in the light most favorable to Relator, the PTAC demonstrates that Relator disclosed to his supervisor an alleged misrepresentation to the investor MUSC, advising in multiple emails that he believed the projections that were to be provided to the investor were inaccurate.   Accepting these allegations as true, there is enough to establish whistleblower activity here to satisfy the Rule 12(b)(6) standard.

### 3.   Rule 9(b) Standard for CEPA Claims

The BAYADA Defendants explain that the heightened pleading standard in Rule 9(b) applies to CEPA claims alleging fraud.   They argue that "[Relator] does not allege any facts to show why he reasonably believed the Inspira budgets were fraudulent (i.e., the substance of BAYADA's alleged misrepresentations), which makes it impossible to state a claim under [Rule] 9(b)'s stringent requirements."   (ECF No. 106 p. 20.)

The PTAC does include allegations pleaded with particularity that Relator reasonably believed the budgets were fraudulent.   Relator includes specific dates he sent emails objecting to the budgets, quoting his objections.   For example, the PTAC states that "Bellomy, presented knowingly false and misleading budget projections to Inspira on April 27, 2016."   (PTAC, ECF No. 88-3 ¶ 186.)   Relator stated to Bellomy: "I am advocating for us telling the truth instead of risking that [Inspira] catches it, which puts … everyone's credibility in a compromised position."   (*Id.* ¶ 187.)

Rule 9(b) imposes a heightened pleading standard for allegations of fraud. "Thus, Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of [] fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who,

what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).   That said, Relator need not know every detail of the fraud: "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"   *Id.* at 216 (quoting *In re Nice Systems, Ltd. Securities Litigation,* 135 F.Supp.2d 551, 577(D.N.J. 2001)).

Here, although Relator did not include the exact numbers involved in the budget, he alleges particular details including the actors involved in the alleged fraud and detailed communications within BAYADA leading up to the alleged fraud.   Relator has pleaded the circumstances of the alleged fraud with sufficient particularity to satisfy the Rule 9(b) standard.

### 4.  Adverse Employment Action under FCA and Retaliatory Action under NJ CEPA

While the BAYADA Defendants concede that Relator's termination constitutes an adverse or retaliatory employment action, the BAYADA Defendants argue that other allegations of Relator's treatment do not constitute an adverse or retaliatory employment action.   (ECF No. 106 p.20.)   These other allegations include that Relator was removed as the lead on the Cape Regional venture, that he was stripped of certain duties, and that he was threatened with discharge.   (*Id.* pp.20, 21.)   Relator argues that because the termination undisputedly constitutes an adverse action, whether any of these other allegations "*standing alone* constitute an adverse employment action under CEPA and/or the FCA is irrelevant."   (ECF 119 p.9.)

Because Relator's termination, as alleged, fulfills the adverse employment action requirement, I need not engage in an analysis of whether any of the other alleged conduct also constitutes an adverse action at this time.

### 5. <u>Conduct Related to FCA Claims</u>

In attacking the FCA retaliation claim, the BAYADA Defendants seek to narrow the pool of allegations that support Relator's FCA retaliation claim, disputing allegations related to the MUSC and Inspira.

With respect to MUSC, BAYADA states that "the parties are in agreement that Relator's FCA retaliation claim is not based on any protected conduct related to the MUSC [joint venture], and only Relator's allegations regarding his protected conduct relating to the [Cape Regional] stand." (ECF No. 106 p.17.) While the BAYADA Defendants point to a concession they allege is quoted from Relator's response to their motion to dismiss, *see id.*, no such brief has yet been filed on the docket. Regardless, Relator does not point to any of the MUSC related allegations in support of its FCA arguments.

With respect to Inspira, the BAYADA Defendants argue that the new allegations about the Inspira budget do not support Relator's retaliation claim, as "they do not qualify as protected conduct under the FCA because the alleged objections were not specifically directed at exposing or deterring fraud against the [G]overnment that is prohibited by the FCA. Relator does not allege that the Inspira budgets were an act of fraud against the [G]overnment nor that presenting allegedly fraudulent budgets to a non-government entity is prohibited by the FCA." (ECF No. 106 p.19 (citation omitted).) Again, Relator does not point to allegations related to Inspira specifically with respect to their FCA claim.

While neither of these points defeat the FCA claim, as there are allegations related to the Cape Regional venture that may support the FCA claim, the BAYADA Defendants' argument here is relevant to the discussion of causation. Thus, I will consider this argument in an analysis of the causation issue as necessary.

### 6.   <u>Causation under FCA and CEPA</u>

"[A] causal connection between protected activity and adverse action may be inferred from: (1) an unusually suggestive temporal proximity between the two; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole."   *United States v. Univ. of Med.*, No. 03-4837, 2010 WL 4116966, at *8 (D.N.J. Oct. 18, 2010), *aff'd sub nom. U.S. ex rel. Hill v. Univ. of Med. & Dentistry of New Jersey*, 448 F. App'x 314 (3d Cir. 2011).

The BAYADA Defendants argue that there is no unusually suggestive temporal proximity nor pattern of antagonism.   (ECF No. 106 p.25.)   In support of their argument that there is no pattern of antagonism, the BAYADA Defendants point to two specific comments made by email and provide additional context for them.   (Id. pp.26, 27.)   The BAYADA Defendants limit their argument to new allegations in the PTAC, and do not discuss the evidence examined as a whole.

Looking to the timeline of events, and the context of Relator's termination, causation is sufficiently pleaded to satisfy the Rule 12(b)(6) standard.   Relator pleads that his "objections to the [Cape Regional] scheme and to the fraudulent budget and financial projections BAYADA submitted to MUSC and Inspira, went unheeded.   Instead, his objections were followed by a pattern of antagonism that ultimately resulting in his firing on August 22, 2016."   (ECF No. 88-3 ¶ 194).   Relator's allegation of antagonism is not conclusory.

Relator alleges that on April 27 and 28, 2016, Relator challenged financial projections sent to Inspira.   (Id. ¶¶ 187–89.)   On May 1, 2016, Relator sent a follow up email on the Inspira projections, saying "I am strongly recommending that we fix everything ASAP" and advising that BAYADA "tell it to them [Inspira] straight."   (Id. ¶ 190 (alteration in original).)   On May 5, 2016, Relator followed up again and expressed his discomfort with adding BAYADA's

chief executive officer's signature on the venture agreement while the budget has "meaningful errors." (Id. ¶191.)

With respect to the Cape Regional venture, in November 2015, Relator alleges that he was instructed not to give certain feedback to Cape Regional's chief executive officer. (Id. ¶195.) The BAYADA Defendants seek to rehabilitate these comments by providing their take on the context of the surrounding language in the emails. A jury, however, could find the fact that Relator received these comments in response to emails he sent pointing to concerns of fraud—like whether the doctor involved in the Cape Regional venture was Medicare qualified—could contribute to a pattern of antagonism, even if not enough alone.

Then, Relator alleges he continued to voice his concerns, including on January 6, 2016, when he stated in an email to BAYADA's chief executive officer, defendant David Baiada, that the Cape Regional venture was "a black and white compliance violation." (Id. ¶196.) On January 28, 2016, he was "informed … he was effectively being taken-off the [Cape Regional] joint venture" and replaced with an employee that had not begun at the job yet. (Id. ¶196.) Relator also alleges that he was told on January 29, 2016 that his emails about Cape Regional were "causing a lot of stir and confusion" and would be vetted moving forward. (Id. ¶197.) Relator further stated on April 11, 2016 that the Cape Regional venture "'was and is a sham' and that the 'structure is non-compliant.'" (Id. ¶199.) On May 5, 2016, Relator alleges he received an email reassigning the majority of his duties to the new employee. (Id.)

With respect to the MUSC SV venture, Relator then alleges that he "objected to BAYADA defrauding MUSC. On August 7, 2015, [Relator] emailed [] Bellomy that the financial projections BAYADA intended to submit to MUSC 'don't make sense to me' and stated that the numbers were '[t]oo

much, too fast.'"   (ECF No. 88-3 ¶ 163 (alteration in original).)   In addition, Relator alleges that on August 10, 2016 he "questioned [] Bellomy on whether MUSC's doctors and discharge planners would stop referring patients to established competitors and whether his financial projections were realistic." (Id. ¶ 164.)   Relator asserts that on August 12, 2016, he emailed Bellomy with market data that demonstrated that "the projections showed revenue that was more than two-times higher than the revenue BAYADA generated in similar ventures in established markets."   (Id. ¶ 165.)   Relator alleges that, then on August 18, 2016, he emailed "Bellomy warning him to '[b]e careful' because an appraiser would be doing its own financial projections for the MUSC deal, which would be 'substantially different.'"   (Id. ¶ 167 (alteration in original).)   Relator alleges that he was terminated on August 22, 2016, "only two business days after his August 18, 2016 objection to the MUSC scheme."   (Id. ¶ 201.)

A jury could find that there is an unusually suggestive temporal proximity between Relator's objections related to the MUSC venture and his termination; there were only four days or two business days between his communication and his termination.   Next, the allegations in the PTAC demonstrate a pattern of antagonism where Relator was repeatedly told not to share certain concerns. Moreover, considering the alleged circumstances as a whole, a jury could determine that there is a connection between Relator expressing his concerns and his termination where Relator continued to express concerns about multiple joint ventures.

While allegations related to Inspira and MUSC are included in the causation discussion above, as they are pertinent for the CEPA claim, there is sufficiently pleaded conduct and causation related to the Cape Regional venture described above to demonstrate causation for the FCA claim without considering the Inspira or MUSC allegations.

In arguing a pattern of antagonism, Relator points to paragraphs 194 through 201 of the PTAC, which all relate to the Cape Regional venture. (ECF No. 119 p.11.) Relator points to comments from Baiada in response to objections Relator made, Relator's removal as lead on the Cape Regional venture on January 28, 2016, the statement that his emails would be vetted on January 29, 2016, his duties being reassigned on May 5, 2016, and the threat of termination on June 9, 2016. (Id. pp.11, 12.) Although the BAYADA Defendants dispute the intention behind these communications, there is enough here to satisfy the Rule 12(b)(6) standard.

I will not deny the Motion to Amend as futile based on a failure to plead causation related to either the CEPA claim nor the FCA claim.

### 7.    Pretext under FCA and CEPA

BAYADA argues that Relator has not demonstrated that the stated reasons for his termination were pretextual. In pleading pretext, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, et al.,* 983 F.2d 509, 531 (3d Cir. 1992)).

Here, Relator has pointed to multiple explanations for his termination. (ECF No. 119 p.13.) While an employee may be terminated for multiple reasons, "a plaintiff may establish a causal link by showing that an employer gave inconsistent reasons for terminating an employee." *Sawa v. RDG-GCS Joint Ventures III*, No. 15-6585, 2017 WL 3033996, at *15 (E.D. Pa. July 14, 2017). He alleges that he was told in June 2016 that he was going to be fired because of team dynamics, although he was not ultimately fired until August.

*Id.*; (PTAC, ECF No. 88-3 ¶ 200.)   BAYADA argues that because he was not actually fired in June, this termination reason is irrelevant.   (ECF No. 106 p.27.)   In August he was told that he was being terminated because "he did not follow directions on how to restructure a responsive bid proposal."   (PTAC, ECF No. 88-3 ¶ 204.)   Relator disputes this purported reason, stating that he was instructed that it was his call how to structure the proposed deal and that outside counsel approved the structure.   (ECF No. 119 p.14.)   BAYADA disputes this characterization, stating that while he was told it was his call, his approach was met with "constructive feedback" and he was told his approach "[f]eels way overengineered."   (ECF No. 106 p.29.)   Undisputedly, however, the email does state, "Your Call."   (*Id.*)   The parties urge different interpretations of the language in this email, which requires a court to engage in fact finding and credibility considerations.   Finally, Relator alleges that BAYADA told his brother that he was fired because he was "not 'diplomatic.'" (PTAC, ECF No. 88-3 ¶ 205.)

The explanations of team dynamics as well as his alleged lack of diplomacy, when paired with other allegations in the PTAC alleging that he was shut down when Relator attempted to point out concerns about misrepresentations and other issues that make up the substance of the FCA violations in this case, are sufficient to plead a retaliatory motive at this stage. In addition, the purported reason for termination, that BAYADA did not agree with Relator's approach to a bid proposal is undermined by the allegation that Relator requested feedback on the bid proposal and, while given feedback, was ultimately told it was his call.   There are sufficient allegations to satisfy the Rule 12(b)(6) standard.

### E.   **Breach of Contract**

The BAYADA Defendants argue that Relator's breach of contract claim is futile because Relator does not allege the existence of a contract, arguing that

BAYADA's Compliance Policy is not a contract. (ECF No. 106 p. 32.) In the alternative, the BAYADA Defendants assert that even if the Compliance Policy could constitute a contract, Relator has not alleged that any of his objections or concerns were about safety or quality of care, and therefore the cited provision is not applicable to his claims. (Id. p. 33.)

Relator responds that he has sufficiently pleaded a breach of contract claim. Relator summarizes that: "(a) Bayada's internal compliance policy— the Standards of Honesty & Confidentiality—is a contract; (b) the policy is widely disseminated, applies to all employees, is definite and comprehensive, and contains no clear or prominent disclaimer; (c) the policy prohibits retaliation against an employee when they suspect the law '[is] being broken;' and (d) Bayada violated the policy, and its corresponding covenant of good faith and fair dealing, by retaliating against him for objecting to Bayada's 'illegal schemes.'" (ECF No. 119 p. 16.)

"A party alleging a breach of contract satisfies its pleading requirement if it alleges: (1) a contract; (2) a breach of that contract; and (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 210 F.Supp.2d 552, 561 (D.N.J. 2002) (citations omitted). An employee may bring a breach of contract action against his employee under New Jersey law "for violating express or implied promises in an employee handbook or manual." *Zawadowicz v. CVS. Corp.*, 99 F. Supp. 2d 518, 534 (D.N.J. 2000). "The test for determining whether a policy created an implied contract 'turns on the reasonable expectations of employees.'" *Id.* In assessing the reasonable expectations of employees, "where a policy is widely disseminated, applies to employees at every level, is definite and comprehensive in its terms, and contains no clear and prominent disclaimer, the policy will create an enforceable contract." *Id.*

In the PTAC, Relator alleges that the language of the Compliance Policy within the Standards of Honesty & Confidentiality created an implied contract. Specifically, he alleges that the policy "promises that 'BAYADA does not retaliate against employees for reporting honestly and confidentially violations or concerns about safety or quality of care.   In fact, it is part of the employees' responsibilities to uphold our values and report instances when they suspect the law or our policies and procedures are being broken.'"   (PTAC, ECF No. 88-3 ¶ 266.)   Relator alleges that this policy was "widely distributed to all employees" (*Id.* p. 267), that it "does not contain a clear and prominent disclaimer that it is not a contract" (*Id.* p. 268), and that "[a]ll employees were expected to comply" and "were required to sign a 'Honesty and Confidentiality Agreement' in connection with the Compliance Policy agreeing, upon threat of termination, to comply with the policy" (*Id.* p. 269).   Relator alleges that BAYADA breached the contract by "retaliating against Relator for attempting to stop BAYADA and the Cape May Defendants and MUSC Defendants' illegal schemes."   (*Id.* p. 272.) Relator alleges damages, stating "Relator has suffered damages including, but not limited to, termination benefits, lost past and future earnings, lost benefits, job-search expenses, humiliation, embarrassment, mental anguish, and emotional distress."   (*Id.* p. 273.)

Although there may be a question as to whether a contract in fact exists, at this stage Relator has sufficiently plead the elements of a breach of contract claim such that amendment is not futile.

### F.   Undue Delay and Dilatory Action (Cape Regional and MUSC)

Cape Regional argues that the Motion to Amend is untimely because "[w]hile there is no black letter time limit after which a motion to amend becomes untimely, six years after the filing of the original complaint, and two years after the filing of the last amended complaint is plainly too long."   (ECF

No. 111 p. 23.)   MUSC argues that "Relator was on notice in 2016 that MUSC [SV] was to be the member of the joint venture that was being negotiated from the beginning, as the letter of August 10, 2016 referenced in the [SAC] at paragraphs 189–191 explicitly stated that the joint venture would [be] between Bayada and MUSC {SV}."   (ECF No. 112 p. 12.)   In addition, Relator should have known that MUSC was a state actor and thus immune.   MUSC SV concludes that "[t]his delay—which was just part and parcel of the serious and unlawful delay caused by the Government's actions in keeping this case secret and unknown to MUSC—warrants the denial of Relator's Motion … ."   (*Id.* pp. 13, 14.)

Relator argues that "because this Motion [to Amend] is being filed before any other [FCA] defendant even responds to the operative complaint, and indeed within 90 days of this Court's order to lift the seal, there is no undue delay associated with the amendment."   (ECF No. 88-1 p. 12.)

The arguments presented by Cape Regional and MUSC that the PTAC includes information that could have been included earlier and the fact that Relator has already filed amended complaints weigh in favor of finding an undue delay.   On the other hand, I do not find that the delay in filing the Motion to Amend has placed a burden on the Court, especially where only one of the remaining groups of defendants had filed a response at the time the Motion to Amend was filed, and that Motion to Dismiss was not fully briefed.

This case is still at the pleadings stage.   The Court has not yet had an opportunity to issue a substantive opinion on any motion, as the Motion to Dismiss that was pending when the Motion to Amend was filed was not fully briefed and has been stayed pending the resolution of the Motion to Amend.   Accordingly, I do not see a concern with preserving judicial economy in permitting the proposed amendment.   Also, although MUSC objects to the substitution of parties, permitting the PTAC to be filed would remove parties

that have settled and would remove MUSC from the litigation rather than engaging in an immunity analysis.   Further, the Motion to Amend was filed only three months after this case was unsealed, and approximately two weeks after the Motion to Dismiss was filed.   These considerations all weigh against a finding of undue delay.   Balancing these considerations, I conclude that there was no undue delay.

### G.   Prejudice

#### 1.   Cape Regional

Cape Regional argues that permitting the proposed amendment is unduly prejudicial because after six years of proceeding "primarily (or exclusively) against Bayada, who is the common denominator in the joint ventures at issue in this case. … Now that the Government has reached settlement agreements with Bayada and Watermark, Relator is now unfairly and improperly trying to switch the focus of his allegations to the remaining [d]efendants."   (ECF No. 111 p.24.)   Cape Regional further explains that it now has to "defend allegations that were only recently brought to its attention, and which are based on conduct that occurred as early as [13] years ago."   (*Id.*)

Although Cape Regional explains that the PTAC seeks to focus its allegations on Cape Regional, where the SAC had a closer focus on Bayada and Watermark, it is unclear how this is unduly prejudicial where Cape Regional does not allege what the practical effect of this refocusing is on its case.   Cape Regional does not allege that it would have had a stronger chance of dismissal on the allegations of the SAC, nor does it have an argument that it has been focusing on the allegations in the SAC to the detriment of its ability to address the allegations in the PTAC.   Accordingly, the proposed amendment will not be denied based on prejudice to Cape Regional.

## 2.  <u>MUSC SV</u>

In the Motion to Amend, Relator explains that he seeks to amend to add MUSC SV pursuant to Rule 15(c), which states in relevant part:

> Relation Back of Amendments.
>
> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
>  …
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Relator explains that the time requirement in Rule 15(c) is satisfied because "MUSC [SV] was served with th[e] Motion [to Amend] and the [PTAC] on November 28, 2023, less than 90 days after the Court lifted the seal on this case." (ECF No. 88-1 pp.14, 15.)  Relator argues that MUSC SV's "ability to marshal evidence to respond to the [P]TAC is no different than MUSC."  (ECF No. 120 p.14.)  Relator also points out the close relationship between MUSC and MUSC SV, including an overlap in officers.  (*Id.*)

MUSC argues that "the [G]overnment, the real party in interest, kept the allegations against MUSC unlawfully sealed, which necessarily means that MUSC and MUSC [SV] now are starting to have to figure out how to defend this case six years after notice should have been given to them."  (ECF No. 112 p.15.)  MUSC SV further argues that "[b]ecause neither MUSC nor MUSC

[SV] was ever contacted by the [G]overnment during the six-year pendency of this case under seal, neither had any notice of any potential allegations against them and had no opportunity to timely preserve the evidence to be used in the litigation."   (*Id.* pp. 15, 16.)   Specific to adding it to this case, MUSC SV states that "[m]oreover, had MUSC or MUSC [SV] known that Relator would attempt to add MUSC [SV] to the lawsuit years later, the entities could have taken steps to preserve highly relevant evidence, including from former employees who are no longer with MUSC or an affiliate."   (*Id.* p. 16.)

MUSC SV was served with PTAC through counsel within the period provided by Rule 4(m)  and with the FCA's requirement that a complaint not be served until the Court orders service.   *See* 31 U.S.C. § 3730(b) (2).   MUSC received a copy of the operative SAC and signed a waiver of service on October 6, 2023.   (ECF No. 49.)   Relator confirmed with MUSC's counsel that counsel were also representing MUSC SV. (ECF No. 88–2 pp. 5, 6.) Upon confirmation, Relator served MUSC SV with the Motion to Amend, including the PTAC, on November 28, 2023.   (*Id.* p. 6.)   On November 29, 2023, Relator filed the Motion to Amend, seeking to replace MUSC with MUSC SV.   (ECF No. 88.)   There was only one month and 21 days between the time that MUSC was made aware of the action and when MUSC SV was explicitly put on notice that it was a potential party.[2]   In addition, as both MUSC and Relator have noted, the operative SAC implicates MUSC SV.   (*See* SAC, ECF No. 16 ¶ 196.) Although years passed between the time that MUSC was first included as a defendant and the Motion to Amend seeking to substitute MUSC SV, MUSC's argument that the entities could have taken steps to preserve evidence absent

---

[2] Even if the Court were to Count the delay between when the case was unsealed on August 31, 2023 and the Motion to Amend, it is still not a significant delay to constitute undue prejudice.

this delay is illogical where neither party became aware of the action until October 2023.

With respect to prejudice, MUSC SV is in the same position to defend the case on the merits as any of the other defendants that were served after the seal was lifted.   Moreover, because of the close relationship between MUSC and MUSC SV, MUSC SV should have known that the action would have been brought against it but for a mistake concerning the party's identity, as MUSC SV knew that it was the entity that engaged in the joint venture described in the complaint, not MUSC.   (*See* ECF No. 112 p. 5 n. 1 (arguing that "[a]s MUSC [SV] was the entity alleged to have contracted with Bayada to form the alleged joint venture, Relator and the government certainly knew at the time of the [o]riginal [c]omplaint in 2017 or latest at the time of the [f]irst [a]mended [c]omplaint in 2018 about the role of MUSC [SV].")).   MUSC SV was referenced in the SAC, the complaint that MUSC was served with.   (*See* SAC, ECF No. 16 ¶ 196.)   Finally, the entities are represented by the same counsel.   (ECF No. 88-2 pp. 5, 6); *See Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 196 (3d Cir. 2001) ("The 'shared attorney' method of imputing Rule 15(c)(3) notice is based on the notion that, when an originally named party and the party who is sought to be added are represented by the same attorney, the attorney is likely to have communicated to the latter party that he may very well be joined in the action.").

Accordingly, the proposed amendment will not be denied based on prejudice to MUSC or MUSC SV.

## CONCLUSION

For the reasons set forth herein, plaintiff's Motion to Amend (ECF No. 88) will be granted and the BAYADA Defendants' Motion to Dismiss (ECF No. 68) will be denied without prejudice as moot.   An order accompanies this Opinion.

_/s/ Edward S. Kiel_
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated:  May 7, 2024