**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA and the STATE of NEW JERSEY *ex rel.* DAVID FREEDMAN,

Plaintiffs,

vs.

BAYADA HOME HEALTH CARE, INC., a Pennsylvania tax exempt corporation, and all successor entities, DAVID BAIADA, CAPE REGIONAL MEDICAL CENTER, INC., CAPE MAY COUNTY, THE VISITING NURSE ASSOCIATION OF CENTRAL JERSEY HEALTH GROUP, INC, CAPE VISITING NURSE ASSOCIATION, INC.; and MUSC STRATEGIC VENTURES,

Defendants.

Civil Action No. 17-cv-06267-ESK-AMD (D. N.J.)

Hon. Edward S. Kiel

**JURY TRIAL DEMANDED**

# **THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

A. The Fraudulent Schemes ..... 2

II. SUMMARY OF THE SCHEMES THAT PRODUCED FALSE CLAIMS TO GOVERNMENT PAYORS ..... 4

A. SCHEME 1: Watermark ..... 4

B. SCHEME 2: Cape May ..... 4

C. SCHEME 3: MUSC and MSV ..... 6

D. SCHEME 4: VNACJ – Home Health ..... 7

E. SCHEME 5: VNACJ - Hospice ..... 9

F. The Illegal Retaliation ..... 9

III. THE FALSE CLAIMS ACT ..... 10

IV. JURISDICTION AND VENUE ..... 13

V. PARTIES ..... 13

VI. APPLICABlE FEDERAL AND STATE LAWS AND REGULATIONS ..... 16

A. Government Health Care Programs ..... 16

B. The Federal and New Jersey False Claims Acts ..... 20

C. The Anti-Kickback Laws of the United States and State of New Jersey ..... 22

1. The Safe Harbors of the AKS ..... 24

2. Fair Market Valuation ..... 28

D. Medicare Prohibitions on Sale of Billing Privileges ..... 28

E. Medicare's Change of Ownership ("CHOW") Process ..... 29

F. Applicable Anti-Retaliation Provisions ..... 29

VII. FACTS AND ALLEGATIONS ..... 30

A. The Transactions Involving Cape May County, New Jersey ..... 31

1. CMRC and VNACJ's Illegal Referral Arrangements and Violation of Medicare Regulations for Home Health ..... 33

2. Cape Regional Medical Center and Visiting Nurse Association of Central New Jersey's Illegal Referral Arrangements and Violation of Medicare Regulations for Hospice Care ........ 39

3. BAYADA and Cape Regional Medical Center's Illegal Referral Arrangements and Violation of Medicare Regulations ........ 41

B. BAYADA's Illegal Joint Venture with MUSC Strategic Ventures ........ 53

C. Harm to the Government: Damages and Penalties ........ 61

D. BAYADA Discharged Relator in Retaliation for His Protests of BAYADA's Illegal Conduct ........ 62

VIII. CLAIMS FOR RELIEF ........ 67

Count I (Against Cape May Defendants)

Federal False Claims Act – False Claims ........ 67

Count II (Against Cape May Defendants)

Federal False Claims Act – Conspiracy ........ 68

Count III (Against Cape May Defendants)

New Jersey False Claims Act ........ 69

Count IV (Against VNA Defendants and Cape May Defendants)

Federal False Claims Act – False Claims ........ 70

Count V (Against VNA Defendants and Cape May Defendants)

Federal False Claims Act – Conspiracy ........ 71

Count VI (Against VNA Defendants and Cape May Defendants)

New Jersey False Claims Act ........ 72

Count VII (Against MSV)

Federal False Claims Act – False Claims ........ 72

Count VIII (Against MSV)

Federal False Claims Act – Conspiracy ........ 73

Count IX Retaliation in Violation of False Claims Act ........ 74

Count X Violation of The New Jersey Conscientious Employee Protection Act ........ 75

Count XI Breach of Contract and Implied Covenant of Good Faith and Fair Dealing ........ 77

Count XII Unjust Enrichment/ Quantum Meruit ........ 79

Count XIII Promissory Estoppel/Quantum Meruit ........ 81

IX. PRAYERS FOR RELIEF ........ 81

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE of NEW JERSEY *ex rel.* DAVID FREEDMAN,<br><br>Plaintiffs,<br><br>vs.<br><br>BAYADA HOME HEALTH CARE, INC., a Pennsylvania tax exempt corporation, and all successor entities, DAVID BAIADA, CAPE REGIONAL MEDICAL CENTER, INC., CAPE MAY COUNTY, THE VISITING NURSE ASSOCIATION OF CENTRAL JERSEY HEALTH GROUP, INC, CAPE VISITING NURSE ASSOCIATION, INC., and MUSC STRATEGIC VENTURES,<br><br>Defendants. | Civil Action No. 17-cv-06267-ESK-AMD (D. N.J.)<br><br>Hon. Edward S. Kiel<br><br>**JURY TRIAL DEMANDED** |

**THIRD AMENDED COMPLAINT**

## I. INTRODUCTION

1. This is an action to recover damages, civil penalties, and other relief on behalf of the United States (the "United States" or the "Federal Government") and the State of New Jersey, arising from false and fraudulent claims made and caused to be made by Cape Regional Medical Center, Inc. ("CRMC"), Cape May County (the "County"), the Visiting Nurse Association of Central Jersey Health Group, Inc. ("VNACJ"), Cape Visiting Nurse Association, Inc. ("Cape VNA"), and MUSC Strategic Ventures ("MSV") (CRMC, the County, VNACJ, Cape VNA, and MSV are collectively referred to herein as the "FCA Defendants"), and/or their agents and employees, in conspiracy with BAYADA Home Health Care, Inc., its successors and assigns ("BAYADA"), against Government Health Care Programs, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended by the Fraud Enforcement and Recovery Act of 2009

and the Patient Protection and Affordable Care Act of 2010, ("the FCA" or "the Act"), and also in violation of the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.* ("the NJFCA"). In addition, Plaintiff-Relator David Freedman ("Relator" or "Plaintiff-Relator") seeks to recover damages from Defendant BAYADA, and its Chief Executive Officer David Baiada (with BAYADA and the FCA Defendants, collectively the "Defendants"), for personal claims of retaliation and wrongful termination/discharge under the FCA and other anti-retaliation laws and for breach of contract, unjust enrichment, quantum meruit, and promissory estoppel under common law.

**A. The Fraudulent Schemes**

2. Put simply, BAYADA is a $1.5 billion revenue national home health care company. One of its primary business models relies on purchasing patients and patient referrals. This practice distorts patient choice and violates both the plain language of the Medicare and Medicaid Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and the purpose behind its prohibitions.

3. BAYADA's AKS violations led to the submission of tens of millions of dollars in false claims. The methods BAYADA used to buy patients involve several different schemes and have co-opted other players necessary to implement the plans. In addition to creating claims for payment fraudulently tainted by kickbacks, the schemes were enabled by fraudulent statements at the outset necessary to induce the illegal referral structures and the stream of kickback-tainted claims.

4. In September 2021, BAYADA agreed to pay $17 million to settle the claims brought by the United States and Relator in this lawsuit alleging that BAYADA paid a kickback to Watermark Retirement Communities, Inc. ("Watermark") by purchasing two of its home health agencies located in Arizona to induce referrals to BAYADA of Medicare beneficiaries from

retirement communities operated by Watermark throughout the United States, and that from January 1, 2014 through October 31, 2022, BAYADA and its affiliated companies submitted false claims for payment to Medicare for services provided to beneficiaries referred to BAYADA as a result of the Watermark kickback transaction.

5. In August 2023, Watermark agreed to pay $4,250,000 to settle the claims brought by the United States and Relator in this lawsuit alleging that Watermark caused the submission of false claims for payment to Medicare for services provided to beneficiaries Watermark referred to the BAYADA from Watermark residential communities, and that in violation of the AKS, Watermark knowingly and willfully solicited BAYADA to purchase the two home health agencies in order to induce referrals of Medicare beneficiaries living in Watermark residential communities to home health agencies operated by BAYADA.

6. As a result of the settlements with BAYADA and Watermark, numerous defendants named in the Second Amended Complaint have been voluntarily dismissed from the lawsuit and are no longer named in this Third Amended Complaint.

7. This Third Amended Complaint's focus is, as explained in detail below, to seek relief against the other participants in BAYADA's kickback and other non-compliant schemes. The Third Amended Complaint also identifies and seeks relief related to other kickback schemes in place prior to BAYADA's involvement, but which BAYADA took over and continued. The Third Amended Complaint also identifies and seeks relief related to Plaintiff-Relator's personal claims for unlawful retaliation and wrongful termination. Each scheme is described below, first in summary fashion and then in detail.

## II. SUMMARY OF THE SCHEMES THAT PRODUCED FALSE CLAIMS TO GOVERNMENT PAYORS

### A. SCHEME 1: Watermark

8. While BAYADA and Watermark have each settled the False Claims Act claims brought against them, the background to the BAYADA/Watermark scheme establishes the methods BAYADA deployed with other participants to violate the False Claims Act.

9. The first BAYADA scheme occurred in 2014 and involves BAYADA and Watermark. Watermark is a national chain of retirement communities. At one time, it also operated a small, fledgling home health company named "Watermark at Home" ("WAH") to cater to certain of its Arizona retirement residents. Watermark's home health company lost money each year.

10. BAYADA bought specific home health company assets from Watermark for an amount way beyond the value of the assets acquired. As additional compensation to Watermark, BAYADA also agreed to refer its patients interested in senior living to Watermark as potential Watermark customers. In exchange, the deal obligated Watermark to enter into preferred provider agreements requiring Watermark to refer its residents to BAYADA. The economics and the accounting of the transaction, along with BAYADA internal communications about the purpose of the deal, all demonstrate that BAYADA paid money to Watermark in order to secure home health patients insured by Medicare. There was no purpose for the Watermark transaction other than for BAYADA to secure patient referrals.

### B. SCHEME 2: Cape May

11. The second BAYADA scheme to buy patients occurred in 2015-2016 and involves the CRMC and the County (collectively, the "Cape May Defendants"). The County owned a Medicare provider agreement & number, a New Jersey Certificate of Need ("CON") and

license to provide home health care services to County residents. BAYADA created a joint venture with the CRMC to provide home health care to County residents, using the County's Medicare agreement, provider number, billing privileges, New Jersey CON and license. The CRMC received a 50% ownership in the joint venture, providing $350,000 in capital plus patient referrals. The CRMC provided no services to the joint venture. BAYADA provided all the services and billed Medicare using the County's provider number and electronically swept all of the Medicare funds from the County's Medicare-linked bank account.

12. Given the size and projected profitability of the joint venture, the $350,000 capital investment by the CRMC did not justify anything close to a 50% equity interest. Thus, BAYADA's grant of a 50% ownership to the CRMC was an illegal payment of "something of value" to induce referrals. The economics and allocation of responsibility of the joint venture structure, as well as direct emails, establish BAYADA's intent to use the 50% ownership grant to induce referrals from the CRMC. Thus, the claims for services provided to those CRMC patient referrals are tainted by kickbacks. While the False Claims Act claims against BAYADA have been released, the CRMC is liable for its participation in the illegal activity.

13. BAYADA had to engage in other fraudulent activity just to create the joint venture entity. That activity include: (a) deceiving the New Jersey Department of Health on March 2, 2016 in a cover letter and a County certified CN-7 License Application to make it appear as if the County employed a Qualified Administrator who met the CMS Standard of the County home health agency; (b) deceiving the Community Health Accreditation Partner ("CHAP"), the accrediting agency, about the County meeting the Medicare Conditions of Participation so that Medicare would certify the agency as meeting the Conditions of Participation and therefore be qualified to make claims and receive Medicare payments under the County's billing number; and

(c) filing a false and misleading CMS Form 588 Medicare Electronic Funds Transfer Authorization to obtain control of the County's Medicare-linked bank account and filing a false and misleading CMS Form 855 Enrollment Application concealing violations of the Conditions of Participation regarding the sale and use of the County's billing privileges, claiming a bona fide Management Agreement and violating the AKS, while concealing the County's complete lack of involvement in their agency operations as the enrolled provider.

**C. SCHEME 3: MUSC and MSV**

14. The third BAYADA scheme occurred in 2016 and involves Medical University of South Carolina ("MUSC") and MSV. BAYADA and MSV created a joint venture home health agency named SCHHA, LLC to provide home health care in South Carolina to patients discharged from MUSC. Even though BAYADA was to provide all of the services, it gave MSV a 49% ownership interest in the joint venture. All that MSV provided in return was $245,000 in initial capital, plus arranging for MUSC's referrals. The two members of the joint venture SCHHA, LLC are BAYADA and MSV.

15. Given the projected size and revenue of the joint venture, a mere $245,000 capital contribution did not justify a 49% ownership interest. Instead, it is clear, both from the economics of the arrangement and from the written communications, that BAYADA's intent in offering MSV the 49% ownership interest ("something of value") was in exchange for arranging for referrals facilitated by MUSC.

16. A very high percentage of the joint venture's home health billings were to come from patients referred by MUSC. Thus, the claims submitted to Medicare on account of home health services provided to those patients were tainted by AKS violations and, therefore, false under the FCA.

17. The Cape May and MUSC/MSV schemes listed above comprise the remaining claims against the other parties BAYADA co-opted in its drive to buy patients.

**D. SCHEME 4: VNACJ – Home Health**

18. As a precursor to the BAYADA-Cape May joint venture described above, VNACJ had formed a similar joint venture with the CRMC. The CMRC-VNACJ joint venture ("Cape VNA") (Cape VNA, the CRMC, VNAJC, and the County are collectively referred to herein as "the VNA Defendants"), featured the same illegal inducements to the CRMC to provide home health referrals to the joint venture, between June 2010 and May 2016. It also featured the same misrepresentations about the role the County would play. The joint venture made those misrepresentations to fraudulently induce Medicare to pay claims under the County provider agreement & number, and to avoid having to disclose the truth about not meeting the Condition of Participation to the accreditation organization and to conceal the change of ownership. The truth would have brought about scrutiny that the joint venture had to avoid—particularly in light of the kickback arrangement's not meeting the Condition for Medicare Payment and the CHAP accreditation fraud that were at the center of the joint venture.

19. As with the BAYADA joint venture, VNACJ gave CRMC a 50% ownership of the joint venture, even though its <u>only</u> role was to provide patient referrals.

20. In addition, the joint venture misled the New Jersey Department of Health, the Medicare accrediting organization, and Medicare about the role of the County and of the CRMC in order to avoid disclosing the change of ownership of the provider agreement, provider number and billing privileges.

21. While the County provided the New Jersey Department of Health the management agreement with Cape VNA in July 2010, what the Government could not have understood from the disclosure was that in reality the County had outsourced all control of its

home health agency and failed to exercise necessary control as it was required to do as the Medicare enrolled provider and state licensee. Had the Government known the truth that the County's Board of Chosen Freeholders did not function as the Governing body and that County employee Dr. Joe Tordella did not ever show up or function as the Administrator or Supervising Physician as represented to the New Jersey Department of Health and required by the Condition of Participation, it would have concluded that the County had in fact transferred the (provider agreement and) rights to the HHA license without prior approval of the New Jersey Department of Health. Such a transfer without NJDH's approval violates N.J.A.C. 8:43E-3.4(a)(5) for which penalties may be assessed at $500 per day from the date of the transfer of the interest to the date of discovery by the Department of Health. Indeed, pursuant to N.J.A.C. 8:43E-5.3(d), "the license is not assignable or transferrable, and it *shall be immediately void* if … *the facility's ownership changes* …" (emphasis added). Without a license, the County had no right to bill or receive payments from Medicare.

22. Joanne Carrocino was the Cape VNA Chair. She also was the CRMC CEO, with whom BAYADA would go on to partner in 2016. Ms. Carrocino did not want her Cape VNA entity's fraudulent bidding conduct and false claim activity to come to light. David Baiada, at the time BAYADA's COO, also knew that the prior joint venture between CRMC and VNACJ was illegal, and if it was illegal then so was his joint venture with CRMC. So, in submitting their documentation to governmental agencies for approval in 2016, CRMC and BAYADA conspired to conceal Cape VNA's earlier fraudulent representations and False Claims Act liability from the State and CMS. This deception enabled CRMC and BAYADA to cover up the Cape VNA scheme and further the Cape May scheme.

**E. SCHEME 5: VNACJ - Hospice**

23. In October 2011, Cape VNA acquired a hospice agency, including the agency's Medicare Provider Agreement and State License.

24. Even though CRMC would split the profits or losses of the purchased hospice agency 50:50, VNACJ was responsible for all management and operational tasks. CRMC had no abilities, no skill-sets and therefore no responsibilities for the operation of the hospice agency. CRMC's only role was to refer patients to the Cape VNA hospice agency from October 2011 to May 2016.

25. In addition, the joint venture misled the New Jersey Department of Health, its Medicare accrediting organization, and Medicare about the role of CRMC in order to avoid disclosing that all referrals were tainted by the AKS, and not meeting the Condition for Medicare Participation as two separately-owned enrolled providers shared a location, phone number and public facing information, and not having a compliant Qualified Administrator.

26. If Cape VNA had made truthful disclosures consistent with how the Hospice actually was operated and supervised, the Government would have uncovered the fact that CRMC was illegally paid kickbacks for referrals to the joint venture-owned Hospice, and would not have approved the joint venture's Hospice as a Medicare-approved provider.

**F. The Illegal Retaliation**

27. Plaintiff-Relator repeatedly objected to, reported, warned about and tried to stop the fraudulent schemes being devised and perpetrated by BAYADA and CRMC with respect to the Cape May public bid transaction, and the false and fraudulent Inspira Health Network ("Inspira") joint venture budget, and the false and fraudulent MUSC financial projections and the subsequent transactions. In retaliation, and in violation of federal and state law protecting whistleblower activity, BAYADA and Baiada engaged in a pattern of antagonism against Plaintiff-

Relator, as described below, and ultimately discharged Relator for his multiple attempts to report and stop the FCA Defendants' illegal and fraudulent conduct. By their conduct, BAYADA and Baiada expected Mr. Freedman to overlook unlawful behavior as a condition of continuing to work for BAYADA while contractually obligating him to operate in compliance with the law, reporting non-compliance and "doing the right thing." They compromised Mr. Freedman and put him in an untenable position along with his compromised colleagues who complicity aided and abetted BAYADA and Baiada, while some were financially incentivized to do so by the BAYADA "generations" incentive compensation profit-sharing plan.

## III. THE FALSE CLAIMS ACT

28. The FCA was enacted during the Civil War, and later amended to enhance the ability of the Government to recover losses sustained as a result of fraud against it. Congress intended the amendments to create incentives for individual citizens with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

29. The FCA prohibits, *inter alia*: knowingly presenting (or causing to be presented) a false or fraudulent claim for payment or approval; knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and, conspiring to commit any of these acts. 31 U.S.C. §§ 3729(a)(1)(A), (B), (G), and (C). Any person who violates the FCA is liable for a civil penalty of up to $21,916 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1); Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133,

https://www.federalregister.gov/documents/2017/02/03/2017-01306/civil-monetary-penaltiesinflation-adjustment-for-2017. The New Jersey FCA has comparable provisions.

30. For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that a defendant specifically intended to commit fraud. *Id*. Unless otherwise indicated, whenever the words "know," "learn," "discover" or similar words indicating knowledge are used in this Complaint, they mean "knowingly" as defined in the FCA.

31. The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. The FCA requires that the Complaint be filed under seal (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit. The person bringing the action is known under the FCA as the "relator."

32. Based on the foregoing federal FCA provisions, and comparable provisions of the State of New Jersey FCA, *qui tam* Plaintiff-Relator seeks, through this action, to recover damages and civil penalties arising from the FCA Defendants' knowing fraud against the United States and the State of New Jersey, including:

a. The County and CRMC's illegal arrangement (with BAYADA) which resulted in the submission to Government Health Care Programs of approximately $24.18 million of false or fraudulent claims for payment since May 2016, and continuing;

c. The County's prior illegal arrangements with VNACJ, CRMC and Cape VNA, which resulted in the submission to Government Health Care Programs of approximately $9.6 million of false or fraudulent claims for payment from July 2010-May 2016;

d. The joint venture between CRMC and VNACJ's illegal AKS arrangements with a hospice agency it acquired in October 2011, which resulted in an estimated $3.089 million of false or fraudulent claims to Government Health Care Programs from October 2011-May 2016; and

e. BAYADA's illegal arrangements with MUSC and MSV, which have resulted in an estimated $26.1 million of false or fraudulent claims to Government Health Care Programs from January 2017 to date, and continuing.

33. Relator also seeks relief for personal claims of retaliation, wrongful termination/discharge, and breach of contract, unjust enrichment, quantum meruit, and promissory estoppel.

34. The allegations set forth in this Complaint have not been publicly disclosed within the meaning of the FCA, as amended, 31 U.S.C. § 3730(e)(4), or analogous provisions of the New Jersey FCA. In the alternative, if the Court finds that there was a public disclosure of such allegations before the filing of this Complaint, Relator is an "original source" as that term is used in the federal and New Jersey false claims acts. *Id.* The allegations made herein arise from Relator's direct and independent knowledge, and Relator voluntarily disclosed and provided his information to both the Federal and State Plaintiffs prior to filing this lawsuit. Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that materially adds to, any publicly disclosed allegations or transactions that may prove to have occurred.

35. To Relator's knowledge, there are no prior pending complaints against the FCA Defendants alleging similar facts related to the FCA Defendants' fraudulent schemes.

36. Prior to the filing of this Complaint, Relator made substantive disclosures to the Government of facts and evidence underlying the allegations in this Complaint.

37. This action is filed *in camera* and under seal pursuant to the requirements of the federal and New Jersey false claims acts.

## IV. JURISDICTION AND VENUE

38. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confer jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has original and supplemental jurisdiction over the state law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action arises from the same transaction or occurrence as the claims brought on behalf of the United States under 31 U.S.C. § 3730.

39. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because BAYADA and Baiada can be found in and transact substantial business in this district, including business related to Defendants' concerted misconduct.

40. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1391, and 1395(a), because a substantial part of the events giving rise to the claims occurred in this District, and a number of the Defendants reside in and/or transact business in this District by, among other things, administering home health care services, operating retirement communities, governing a County, operating a major medical center, and engaging in illegal arrangements to pay and receive kickbacks to induce patient referrals made within this district.

## V. PARTIES

41. Plaintiffs, the United States of America and the State of New Jersey, are the real parties in interest with respect to the federal and state false claims acts *qui tam* claims herein. At this time, Plaintiff-Relator David Freedman is pursuing causes of action on behalf of the named Plaintiffs the United States and New Jersey on the false claims acts *qui tam* claims set forth herein pursuant to 31 U.S.C. § 3730(b) and comparable provisions of the New Jersey FCA.

42. Plaintiff-Relator David Freedman is a citizen of California (as of the original date of filing) and served as BAYADA's Director of Strategic Growth from January 2009

until August 2016. Mr. Freedman is familiar with and has personal knowledge of Defendants' business operations through transactions he oversaw at BAYADA. From January 2009 to November 2015, Mr. Freedman reported to BAYADA's then Chief Operating Officer, David Baiada, and from December 2015 until August 22, 2016, when he was discharged from his position, he reported to Chief Strategic Growth Officer (and former Senior Living Division Director), Greg Bellomy, who was under Mr. Baiada's supervision. In Mr. Baiada's capacity as Chief Operating Officer, he exercised authority and control over both Mr. Bellomy and Mr. Freedman from December 2015 until Mr. Freedman's discharge on August 22, 2016

43. Defendant BAYADA is governed by a Board of Trustees with defendant David Baiada serving as its CEO. BAYADA is a $1.5 billion-revenue corporation with its Headquarters in Moorestown, New Jersey. BAYADA provides home health care services to some 28,000 patients, at over 360 locations, in 23 states. *See* https://www.BAYADA.com. Approximately 18% (a projected $240 million in 2017) of BAYADA's revenue comes from Medicare reimbursement and 19% (a projected $258 million in 2017) from Medicaid reimbursement. In addition, BAYADA receives substantial payments from Managed Medicaid programs and other government funded health care or health insurance programs. In addition to home health care, BAYADA provides other services including, but not limited to, hospice services.

44. Defendant David Baiada is a resident of Pennsylvania (as of the original date of filing), Chief Executive Officer of BAYADA, and the son of BAYADA'S founder, previous 100% owner and President, and current Chairman of the Board J. Mark Baiada. David Baiada was Relator's direct supervisor, and had decision-making authority over the transactions and transaction compliance during the events alleged herein.

45. Defendant Cape Regional Medical Center, Inc. is a hospital based in the Cape May Court House section of Middle Township, New Jersey. Joanne Carrocino served as Chief Executive Officer of CRMC at all times relevant to this Complaint. Since 2010, CRMC, as a 50% joint venture owner, has contracted with Cape May County to operate its Medicare-certified Home Health Care agency while retaining its financial results, and to provide home health care services to residents of the County through joint ventures formed first with VNACJ and later with BAYADA.

46. Defendant Cape May County is a subdivision of the State of New Jersey. The County owns a home health care agency that previously did business as Crest Haven Home Care.

47. Defendant Visiting Nurse Association of Central Jersey Home Health Group, Inc. is a New Jersey non-profit corporation, which partnered with CRMC, and together with CRMC contracted with Cape May County to operate its Medicare-certified Home Health agency while retaining its financial results, and to provide home health care services to its residents between July 2010 and May 2016.

48. Defendant Cape Visiting Nurse Association Inc. was a New Jersey non-profit corporation and joint venture formed between VNACJ and CRMC for the purposes of contracting with Cape May County to provide home health care services to its residents between July 2010 and May 2016, and hospice services between October 2011 and May 2016. On information and belief, the entity was dissolved in 2016.

49. Defendant Medical University of South Carolina is South Carolina's only comprehensive academic medical center. Among its facilities are a 750-bed medical center and physicians' practices. *See* http://www.muschealth.org/index.html. It is located in Charleston,

South Carolina. The South Carolina Constitution provides, in relevant part, that "neither the State nor any of its political subdivisions shall become a joint owner of or stockholder in any company, association, or corporation." S.C. Const. art. X, § 11.

50. Defendant MUSC Strategic Ventures was incorporated on September 2, 2015 pursuant to the South Carolina Nonprofit Corporation Act to allow affiliation with tax-exempt entities to operate, promote and support MUSC and University Medical Associates ("UMA"). MSV was first formed under the name "MUSC Health" and became "MUSC Strategic Ventures" in December 2015. UMA is a nonprofit corporation organized under the laws of South Carolina in 1991, which has three for-profit subsidiaries and a nonprofit subsidiary which are subject to federal income tax.

## VI. APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS

### A. Government Health Care Programs

51. The Health Insurance for the Aged and Disabled Program, known as Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare"), is a health insurance program administered by the United States Government and funded by taxpayer revenue. The United States Department of Health and Human Services ("HHS"), through its Centers for Medicare and Medicaid Services, oversees Medicare.

52. Medicare was designed to be a health insurance program and to provide for payment of, among other things, medical services and equipment to persons over 65 years of age and certain others who qualify under Medicare's terms and conditions. The Medicare program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. *See* 42 U.S.C. §§ 1395c-1395i-4. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as

services provided to Medicare patients by physicians, laboratories, home health nursing aides and diagnostic testing facilities. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medicare Part A and/or Part B cover some home health care services including those provided by BAYADA. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

53. The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"), is a health insurance program administered by the United States Government and the States and is funded jointly by state and federal taxpayer revenue. CMS and HHS oversee Medicaid jointly with agencies in each State. The state of New Jersey participates in Medicaid.

54. Medicaid is designed to assist participating States in providing medical services, medical equipment, and prescription drugs to needy individuals that qualify for Medicaid. The States and federal government share reimbursement costs. States directly pay providers, and then obtain the federal contribution from accounts drawn on the United States Treasury. 42 C.F.R. §§ 430.0-*et seq*. Federal funding for the Medicaid Program includes support for Medicare Savings Programs which help qualifying Medicare beneficiaries pay Part A and B premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs consist of the Qualified Medicare Beneficiary Program, 42 U.S.C. § 1396d(p)(1), the Specified Low-Income Medicare Beneficiary Program, 42 U.S.C. § 1396a(a)(10)(E)(iii), the Qualifying Individual Program, 42 U.S.C. § 1396a(a)(10)(E)(iv), and the Qualified Disabled and Working Individuals Program, 42 U.S.C. § 1396d(s). Medicaid may serve as the primary insurer, or in some instances as the secondary insurer (*e.g.*, with Medicare or private insurance paying primary coverage).

55. The Civilian Health and Medical Program of the United States (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. TRICARE pays for, among other things, medical devices and surgeries for its beneficiaries. CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability, or for those who died from a VA-rated-service-connected disability.

56. The Federal Employee Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. It pays for, among other things, medical devices and surgeries for its beneficiaries. Under the FEHBP, the federal employee is covered by private payor health insurance which is in turn subsidized in part by the federal government. As a result, fraud on a patient covered by the FEHBP constitutes fraud on the federal government and the loss of federal funds.

57. The federal government operates hospitals, including through its Departments of Defense and VA, and receives and uses federal funds to provide medication to patients treated at these facilities and otherwise, as well as outpatient services. A network of already established VA hospitals and services make up the VA health care system.

58. Together, the programs described above, and any other government-funded health care programs, are referred to as "Government Health Care Programs."

59. Providers that wish to be eligible to obtain Medicare reimbursement, must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by

Medicare is conditioned upon the claim and the underlying transaction complying with all applicable laws, including without limitation, the federal AKS and the Stark law. *See, e.g.*, Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners). *See generally* https://www.cms.gov/medicare/provider-enrollment-and-certification/medicareprovidersupenroll/enrollmentapplications.html (containing all Medicare enrollment forms).

60. New Jersey Medicaid Provider Enrollment Forms require similar certifications of compliance with Medicaid rules and regulations, as well as the federal AKS and the New Jersey Anti-Kickback Statute, N.J. Stat. § 30:4D-17(c) ("New Jersey AKS"):

> **NOTE:** There are federal and state statutes and regulations governing kickbacks and referral practices which may apply to the applicant and to those individuals and entities listed in this application. These statutes and regulations include, but are not limited to: The Federal Medicare and Medicaid Anti-Kickback Statute (42 USC 1320a-7b(b)); the Federal Safe Harbor Regulations (42 CFR 1001.952); the Stark Laws (42 USC 1395nn, 42 USC 1396b(s) and implementing regulations); the State Medicaid Anti-Kickback Statute (NJS 30:4D-17(c)); and the Code Law (NJS 45:9-22.4 et. seq.) and its implementing regulations (NJAC 13:35-6.17)). Applicants should carefully review and understand these legal requirements and prohibitions, because signing this Agreement is *a representation that there is full compliance with all of these statutes and regulations*.

State of New Jersey Provider Application FD-20 (emphasis added).

61. Claims submitted by health care providers to Government Health Care Programs contain similar representations and certifications. *See, e.g.*, Form 1450 (UB04) (institutional provider paper claim form for Medicare and Medicaid); 837I (electronic version of Form 1450).

62. When submitting a claim for payment, a provider does so subject to and under the terms of its certification to the United States that the services were delivered in

accordance with federal law, including, for example, Government Health Care Program laws and regulations. New Jersey's Medicaid claim form certification also incorporates relevant state laws and regulations.

63. Government Health Care Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for services provided in violation of relevant state or federal laws, including the AKS, 42 U.S.C. § 1320a-7b(b).

**B. The Federal and New Jersey False Claims Acts**

64. The federal FCA creates liability for "any person who," among other things:

a. "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

b. "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

c. "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

d. "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

65. The FCA further provides that any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, further increases the civil penalty. 82 Fed. Reg. 9131, 9133 (Feb. 3, 2017).

66. The FCA provides that "the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

67. The FCA provides that "the term 'claim' – (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

68. The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 31 U.S.C. § 3729(b)(3). Moreover, in the health care context, such as Medicare and Medicaid, an obligation is defined as any "overpayment retained by a person after the deadline for reporting and returning the overpayment" and an overpayment must be reported "by the later of…60 days after the date on which the overpayment was identified…or the date any corresponding cost report is due, if applicable." 42 U.S.C. § 1128J(d); *see also* 42 U.S.C. § 1320a-7k(d) (describing the obligation to report overpayments within 60 days).

69. The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

70. Many states, including New Jersey, have passed false claims act laws that closely track the federal FCA. The state false claims acts apply, *inter alia*, to the state portion of Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-state funded Medicaid program and failure to report and return any overpayments therefrom. The acts of the Cape May Defendants alleged herein also constitute violations of the NJFCA. The NJFCA contains a *qui tam* provision providing for a relator's rights to claim a share of the State's recovery under § 2A:32C-7.

**C. The Anti-Kickback Laws of the United States and State of New Jersey**

71. The AKS, 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1972 and has been amended many times since. The AKS arose out of Congressional concern that payoffs to those who can influence health care decisions corrupt medical decision-making and result in the provision of goods and services that are medically inappropriate, unduly costly, medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of Government Health Care Programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

72. The AKS prohibits any person or entity from soliciting or receiving or offering or paying any remuneration to induce any person to refer an individual for a service for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback). The statute provides that whoever violates these

prohibitions "[s]hall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both." 42 U.S.C. § 1320a-7b(b). The AKS further defines "remuneration" to include "transfers of items or services for free or for other than fair market value." *Id.* § 1320a-7a(i)(6).

73. Underscoring the breadth of the statutory definition, the Health and Human Services Office of Inspector-General (HHS-OIG) has interpreted the term "remuneration" to cover "anything of value in any form whatsoever." *OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35958 (July 29, 1991); *see also United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008).

74. A monetary payment can constitute remuneration in violation of the AKS, as can referrals including a *quid pro quo* arrangement in which parties offer referrals to each other. *See United States ex rel. Kester v. Novartis Pharmaceuticals Corp.*, 41 F. Supp. 3d 323, 337-38 (S.D.N.Y. 2014).

75. New Jersey along with many other states has an anti-kickback law similar to the AKS that applies to medical providers and entities participating in its Medicaid program. The New Jersey Anti-Kickback Statute prohibits any entity from soliciting, offering, or receiving "any kickback, rebate or bribe in connection with . . . [t]he furnishing of items or services for which payment is or may be made in whole or in part" by or whose cost may be used to obtain benefits under New Jersey medical assistance programs. New Jersey Stat. § 30:4D-17(c).

76. Compliance with the federal and state anti-kickback laws is a precondition to participation and to payment as a health care provider under Medicare and Medicaid. *See generally United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011) (Medicare); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir.

2011) (Medicare); *State of New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) (Medicaid); *United States ex rel. Westmoreland v. Amgen Inc*., 812 F. Supp. 2d 39, 53-54 (D. Mass. 2011) ("If providers could demand payment for claims resulting from kickback violations, then the Anti–Kickback Statute would be meaningless legislation."). The Patient Protection and Affordable Care Act of 2010 amended the AKS to make clear that violations of the AKS can subject the perpetrator to liability under the federal FCA and to clarify that no actual knowledge of the section or specific intent to commit a violation of the section is required. 42 U.S.C. §1320a-7b (g), (h). Accordingly, claims for payment for services that result from kickbacks are false or fraudulent under the FCA.

77. Violation of the AKS subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

78. Pursuant to provider agreements and claim forms, providers who participate in a federal health care program including Medicare Part B generally must certify that they have complied with all applicable federal and State rules and regulations, including applicable anti-kickback statutes. *See* discussion above at ¶¶ 51-63.

***1. The Safe Harbors of the AKS***

79. The AKS contains safe harbors that exempt certain transactions from its prohibitions. *See* 42 U.S.C. § 1320a-7(b)(3). Once the Government has demonstrated each element of a violation of the AKS, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by such a safe harbor or exception. The Government need not prove as part of its affirmative case that defendant's conduct at issue does not fit within a safe harbor. *United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008). Conduct must fit squarely within a safe harbor to qualify for protection.

80. Relevantly, the regulations provide a safe harbor for "investment interests," applicable to compliant joint ventures. 42 C.F.R. § 1001.952(a). However, to qualify for this safe harbor, no more than 40% of the ownership of the joint venture may be offered to an investor in a position to influence referrals. 42 C.F.R. § 1001.952(a)(2)(i). If more than 40% of the investment interest is held by such an investor, the safe harbor does not apply. *See id.*

81. Under 42 U.S.C. § 1320a-7d(b), the HHS-OIG provides guidance to providers on whether proposed business arrangements risk violating the AKS. For example, a 1989 Special Fraud Alert warned against "suspect joint ventures" that are "intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals." *See* HHS-OIG Special Fraud Alert on Joint Venture Arrangements (the "1989 Special Fraud Alert on Joint Ventures"), reprinted in the Federal Register in 1994 (59 Fed. Reg. 65372, 65373 (Dec. 19, 1994)), http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html. The 1989 Special Fraud Alert on Joint Ventures noted that in "suspect" structures "one of the parties may be an ongoing entity already engaged in a particular line of business. . . . In some of these cases, the joint venture can be best characterized as a 'shell.'" *Id.* HHS-OIG also noted that "suspect financing and profit distributions" may be characterized by arrangements in which the "capital invested by the physician may be disproportionately small and the returns on investment may be disproportionately large when compared to a typical investment in a new business enterprise." *Id.*

82. In a 2003 Special Advisory Opinion, HHS-OIG provided common elements exhibited by "problematic" joint ventures:

> **First**, the Owner expands into a related line of business, which is dependent on referrals from, or other business generated by, the Owner's existing business.
>
> * * *

> **Second**, the Owner neither operates the new business itself nor commits substantial financial, capital, or human resources to the venture. Instead, it contracts out substantially all the operations of the new business. The Manager/Supplier typically agrees to provide not only management services, but also a range of other services, such as the inventory necessary to run the business, office and health care personnel, billing support, and space. While the Manager/Supplier essentially operates the business, the billing of insurers and patients is done in the name of the Owner.
>
> * * *
>
> **Third**, the Manager/Supplier is an established provider of the same services as the Owner's new line of business. In other words, absent the contractual arrangement, the Manager/Supplier would be a competitor of the new line of business, providing items and services in its own right, billing insurers and patients in its own name, and collecting reimbursement.
>
> **Fourth**, the Owner and the Manager/Supplier share in the economic benefit of the Owner's new business. The Manager/Supplier takes its share in the form of payments under the various contracts with the Owner; the Owner receives its share in the form of the residual profit from the new business.
>
> **Fifth**, aggregate payments to the Manager/Supplier typically vary with the value or volume of business generated for the new business by the Owner.

HHS-OIG Special Advisory Bulletin, Contractual Joint Ventures (April 2003), http://www.oig.hhs.gov/fraud/docs/alertsandbulletins/042303SABJointVentures.pdf (emphasis added).

83. HHS-OIG has also addressed AKS and safe harbor issues through Advisory Opinions. For example, in HHS-OIG Advisory Opinion No. 11-15 (October 3, 2011), https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn11-15.pdf, the OIG opined that the requestor's proposed arrangement –which the OIG characterized as similar to questionable joint venture arrangements that have been the subject of OIG guidance *supra*—did not meet any of the potentially applicable AKS safe harbor (including the small entity investment safe harbor,

42 C.F.R. § 1001.952(a)(2)) and thus could potentially generate prohibited remuneration under the AKS.

84. In HHS-OIG Advisory Opinion No. 97-5 (October 6, 1997), *see* https://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf, the OIG found that the small entity investment safe harbor did not apply, and in considering whether there was prohibited remuneration stated: "However, even in situations where each party's return is proportionate with its investment, the mere opportunity to invest (and consequently receive profit distributions) may in certain circumstances constitute illegal remuneration if offered in exchange for past or future referrals. Such situations may include arrangements where one or several investors in a joint venture control a sufficiently large stream of referrals to make the venture's financial success highly likely, or where one investor has an established track record with similar ventures or the financial investment required is so small that the investors have little or no real risk." (*Id.* at p. 10.)

85. In HHS-OIG Advisory Opinion No. 11-03 (April 7, 2011), *see* https://oig.hhs.gov/fraud/docs/advisoryopinions/2011/advopn11-03.pdf, the OIG noted at page 4 its prior guidance expressing its "longstanding concerns about certain problematic joint venture arrangements between those in a position to refer business, such as the LTC [long-term care] Facilities here, and those furnishing items or services for which Medicare or Medicaid pays, especially when all or most of the business of the joint venture is derived from one or more of the joint venturers." (*Id.* at p. 4.) (citing 1989 Special Fraud Alert on Joint Ventures). The OIG concluded at page 6:

> Accordingly, based on the facts presented here, we are unable to exclude the possibility that the Proposed Arrangement is designed to permit the Requestor [a long-term care pharmacy] to do indirectly what it cannot do directly; that is, to pay the LTC [Long Term Care] Facility owners a share of the profits from their

pharmaceutical products and services referrals. Indeed, there is a significant risk that the Proposed Arrangement would be an improper joint venture that would be used as a vehicle to reward the LTC Facility owners for their referrals.

### *2. Fair Market Valuation*

86. In multiple advisory opinions, the OIG has stated that a financial arrangement violates the AKS if "*one* purpose of the remuneration is to obtain money for the referral of services or to induce further referrals." *See*, *e.g.*, OIG Advisory Opinion No. 97-5, at 4 (Oct. 6, 1997), http://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989) and *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985)) (emphasis in original). Even where there is more than one purpose of the remuneration, if one of them is to obtain money from referrals, the statute is violated. *Greber*, 760 F.2d at 72 ("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services."); *see also United States v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 30 (1st Cir. 1989).

87. Under the AKS, payment of more than "fair market value" for an item or service constitutes improper remuneration in violation of the law. *See* 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" under the AKS as "transfers of items or services for free or for other than fair market value.").

## D. Medicare Prohibitions on Sale of Billing Privileges

88. CMS regulations also prohibit payment of claims procured by the sale, use or transfer of Medicare billing privileges. 42 C.F.R. § 424.550.

89. CMS considers compliance with § 424.550 important to ensuring the integrity of its contracts. It has identified compliance with this provision as a condition of payment and held that failure to comply with the provision warrants revocation of a provider's billing

privileges. *See* D.A.B. No. CR3124 (Feb. 20, 2014) ("the uncontroverted facts compel revocation of Petitioner's enrollment because it allowed an individual to improperly use its billing number.").

90. Claims that have been procured by the sale, use or transfer of Medicare billing privileges, if submitted to CMS, thus constitute materially false or fraudulent claims under the False Claims Act. *See Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989, 2002–04 (2016); *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 313 (3d Cir. 2011).

**E. Medicare's Change of Ownership ("CHOW") Process**

91. Medicare regulations establish that certain events, such as a lease of a health care provider, the formation of a partnership or the removal or addition of a partner, constitute a Change of Ownership, requiring notice be provided to CMS. 42 C.F.R. § 489.18; Medicare State Operations Manual (Pub. 100-07) § 3210.1B1 and § 3210.1D4. A management agreement constitutes a Change of Ownership if the prior owner "relinquished all authority and responsibility" for the provider organization. *See* Medicare State Operations Manual (Pub. 100-07), § 3210.1.D.

92. The CHOW process clarifies to CMS and providers the rights and responsibilities of the provider. *Id*. Moreover, CHOWs "may be treated differently for purposes of reimbursement." *Id.* at § 3210.1D. For example, liabilities from fraud or overpayments may transfer to the new owner.

**F. Applicable Anti-Retaliation Provisions**

93. The FCA prohibits a whistleblower from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts" performed "in furtherance of" an FCA action or efforts to stop violations of the FCA. 31 U.S.C. § 3730(h). The statute entitles an aggrieved

whistleblower "to all relief necessary" to make him or her whole, including reinstatement, double back pay, interest on the back pay, and litigation costs and reasonable attorneys' fees. *Id.*

94. The New Jersey FCA provides similar protections. *See* N.J. Stat. § 2A:32C-10.b. Moreover, employers may not "make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a State or law enforcement agency or from acting to further a false claims action." *Id.* at§ 2A:32C-10.a.

95. The New Jersey Conscientious Employee Protection Act ("CEPA") prohibits employers from taking adverse action against a whistleblower who discloses or objects to activities that the whistleblower reasonably believes are criminal, fraudulent, or violate any law or regulation, including any activity of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client or customer. N.J. Stat. Ann. § 34:19-3. The statute applies to "any individual who performs services for and under the control and direction of an employer for wages or other remuneration," and includes by its plain terms independent contractors. *Id.* at § 34:19-2(b); *see also D'Annunzio v. Prudential Ins. Co. of America*, 927 A.2d 113, 119 (N.J. 2007).

## VII. FACTS AND ALLEGATIONS

96. BAYADA's Division Directors and senior management were compensated, in part, through incentive profit-sharing arrangements and were thus strongly motivated to support the initiative. David and Mark Baiada valued profit-maximization, which is what they incentivized and measured. BAYADA published revenue for each office companywide in the "BAYADA Bulletin" every week and announced when an office reached a new and higher financial metric. Throughout BAYADA, there is a sharing with the local offices of about 30-32% of the profits (or "surplus"). That arrangement has been in place since 2006. The incentive structure includes the local office up to the Bayada CEO. Everyone in the chain of command is personally financially

incentivized to maximize profits as each gets a cut. Hence, the decision-making at each upper management level is infected by personal incentives. It created groupthink for money on steroids and was pernicious.

97. Below is a chart of the profit-sharing opportunities BAYADA makes available throughout the company. If there is no one in a given role over a given office, then the chart adjusts to increase the amounts paid to the existing generations:

| | | |
|---|---|---|
| Generation 1 | Office Director | 10.00% |
| Generation 2 | Area Director | 8.00% |
| Generation 3 | Division Director | 6.00% |
| Generation 4 | Regional Director | 4.00% |
| Generation 5 | Practice Leader | 2.00% |
| Generation 6 | Chief Operating Officer | 1.00% |
| Generation 7 | Chief Executive Officer | 1.00% |

98. The new Hospital Managed Services Division ("HMS") was formed on December 1, 2015. Its new leadership, Greg Bellomy, Chief Strategic Growth Officer, and Brad Parrish, Division Director (who began work at BAYADA on February 1, 2016), were also incentivized by profit sharing. Messrs. Bellomy and Parrish had to generate leads by having contractors (Gerry Scrivener and John Whitman), cold calling referral source hospitals, and marketing to make joint venture or management services deals to earn profit sharing. David Baiada and Greg Bellomy wanted the new HMS Division to succeed and they needed to do deals with hospitals so that they had a track record to sell to prospective hospitals. BAYADA's profit-sharing incentives caused Messrs. Bellomy and Parrish to engage in conduct that violated the AKS, FCA and NJFCA.

**A. The Transactions Involving Cape May County, New Jersey**

99. The County of Cape May, New Jersey, owns a home health care agency previously doing business as Crest Haven Home Care, until July 9, 2010. The County has its own

Medicare provider number and publicly solicited bids twice from healthcare providers to run the agency for five-year periods, once in March 2010 and again in October 2015.

100. Cape May's bid solicitation documents provide that the winning bidder must pay the County a one-time payment. Joint ventures known as Cape VNA and then BAYADA's joint venture Cape Regional Home Health Care, LLC ("CRHHC") each offered $100,000, in 2010 and 2015, respectively, for the so-called operating or managing rights. The County "provider" then bills for Medicare-reimbursed services to CMS in the County's name, using the County's provider number, billing privileges, and Medicare-linked TD Bank account. Some services are similarly billed to New Jersey's Medicaid program. After the County receives the Government payment, the County sent monthly checks to Cape VNA from July 2010 to May 2016. Beginning in June 2016, instead of sending checks, the County electronically swept the funds from its Medicare-linked TD Bank account to BAYADA's Citizens Bank account. Both Cape VNA and BAYADA remitted and remit 5% of those collected funds back to the County as a "rent" payment for the past and ongoing use of the provider number, billing privileges and license.

101. Cape May County's arrangement amounts to a $100,000 sale and five-year lease of its Medicare billing number and privileges, violating the Medicare regulations prohibiting the sale and transfer of a billing number and the use of billing privileges by another entity. 42 C.F.R. § 424.550. This arrangement began before BAYADA became involved. Relator informed David Baiada on November 10, 2015 that the past and proposed transaction represented "Bad compliance and bad lawyering." Relator informed BAYADA Chief Compliance Officer Linda Pilla via email on November 24, 2015 that the proposed bid from CRMC and BAYADA violated the express Condition for Medicare Payment 424.550(a). BAYADA chose to proceed with the joint venture transaction anyway.

### *1. CMRC and VNACJ's Illegal Referral Arrangements and Violation of Medicare Regulations for Home Health*

102. In 2010, CRMC and VNACJ formed Cape VNA, a joint venture to operate Cape May County's home health agency. Profits of Cape VNA were to be split 50:50 between VNACJ and CRMC, and VNACJ was responsible for all management and operational tasks. Despite their 50:50 profit split, CRMC had no prior experience in home health care. In their April 13, 2010 joint response to the County's request for proposal, CRMC (represented by its president and CEO Joanne Carrocino) and VNACJ (represented by its president and CEO Mary Ann Christopher) acknowledged that VNACJ was the "largest home care provider of community-based services in New Jersey …." CRMC, on the other hand, "had a long history of commitment to the community" but no experience operating a home health agency.

103. Given VNACJ's long history and experience, VNACJ did not need CRMC to help manage and operate the home health agency. Rather, the reason to enter a 50:50 joint venture with CRMC was because CRMC was in a position to refer its patients to the County HHA (financially owned and controlled by the joint venture for five years at a time) and to promote the agency to discharge planners, its affiliates and physicians.

104. The opportunity for CRMC to invest and own 50% of the venture and opportunity to profit from its referrals to the joint venture's home health agency is illegal anti-kickback remuneration. *See* October 6, 1997 OIG Advisory Opinion 97-5, page 10 ("However, even in situations where each party's return is proportionate with its investment, the mere opportunity to invest (and consequently receive profit distributions) may in certain circumstances constitute illegal remuneration if offered in exchange for past or future referrals. Such situations may include arrangements where one or several investors in a joint venture control a sufficiently large stream of referrals to make the venture's financial success highly likely, or

where one investor has an established track record with similar ventures or the financial investment required is so small that the investors have little or no real risk.").

105. As reflected in the July 9, 2010 Services Agreement-VNACJ ("2010 VNACJ Services Agreement"), given that VNACJ has "significant experience in the provision of management services to home health agencies," Cape VNA agreed to have VNACJ "manage … the affairs of the Company and furnish the management services described" in the agreement, to wit: (a) "the authority to supervise, operate and manage the operations and affairs of the Company for the account of the Company," (b) "the employment, termination of employment and changes in terms of employment of the Executive Director of the Company," (c) the "timely preparation … of annual capital and operating budgets of the Company, (d) "the employment, termination of employment and changes in terms of employment of such management personnel as may be designated from time to time by the Board," (e) the "employment, termination of employment and changes in terms of employment of all necessary and appropriate personnel to properly carry out the business and operations of the Company, (f) the "execution and implementation of all policies and directives of the Board," (g) "the establishment of appropriate rates and charges for all the services of the Company, (h) the "establishment of proper and appropriate accounts in the name of the Company and/or [VNACJ]", (i) the "conduct of fundraising and development activities of the Company in coordination with CRMC," (j) the "development, for approval by the Board, of strategic plans for the Company," (k) the "proposal , for approval by the Board, of such capital contributions as the Company may require from time to time," (l) the "development and implementation of marketing plans in coordination with CRMC, (m) the "development and implementation of such policies and procedures as shall be required or appropriate to assure compliance with law or with accepted and recognized industry standards," and (n) the "proper and

appropriate training of all the Company staff." 2010 VNACJ Services Agreement at 2. In fact, the 2010 VNACJ Services Agreement attributed another 16 separate management tasks as well, including: managing the accounting systems and financial controls such as managing the books and records, working with the audit firm, paying bills, issuing bills, collecting bills, and procuring insurance; providing all "general administrative services," including development, maintenance and implementation of "all necessary and appropriate policies and procedures with respect to the business and operations," the "proper maintenance and implementation of all necessary and appropriate payroll and human resources records, procedures and policies," maintaining all property and facilities, negotiating all contracts, preparing all reports, complying with all compliance and accreditation requirements, and addressing "clinical outcome and patient satisfaction." *Id.* at 3 (listing responsibilities from (o) to (dd)).

106. Evidencing their knowing violation of the AKS, the joint venture of Cape VNA concocted a sham role for CRMC. In its July 9, 2010 Services Agreement ("2010 CRMC Services Agreement"), CRMC was tasked simply to "manage the human resources and marketing affairs of the Company, and provide support and services relating to fundraising activities of the Company …." 2010 CRMC Services Agreement at 1. As it is, these limited "management" services were to be "coordinated" with VNACJ (*id.* at 2), who as described above separately had undertaken the human resources management, fundraising and development responsibilities. What was truly left for CMRC then was the "development and implementation of marketing plans" (*id.*); in other words, to serve as the major referral source for the joint venture.

107. Cape VNA, VNACJ and CRMC caused false claims to be filed based on this scheme whereby CRMC would profit from its 50:50 joint venture with VNACJ based on its referrals to the joint venture, while operating the County's HHA.

108. During the pendency of the Cape VNA contract, the County of Cape May had no working capital, office space, employees, marketing, or furniture, fixtures or equipment for its home health agency. Thus, the County essentially transferred its billing privileges, provider agreement and license to the Cape VNA joint venture. This unauthorized transfer violated Medicare's express Condition for Payment regulations, and the prohibition of the sale, use or transfer of a billing number or billing privileges. 42 C.F.R. § 424.550.

109. On July 7, 2010, Mary Pat Hastings, the County's former Administrator for its home health agency, wrote on behalf of the County to the New Jersey Department of Health informing it that Cape VNA would be providing the home health services under the County's Medicaid existing Medicare provider number. The County's letter fraudulently asserted that Dr. Tordella—as an employee or agent of the County—would succeed Ms. Hastings as the Administrator overseeing the County Home Health Agency. Dr. Tordella also fraudulently signed the false July 9, 2010 855A Medicare Enrollment Application as Administrator on behalf of County of Cape May and Cape VNA.

110. Both the July 7, 2010 letter and the 885A form were materially false because Dr. Tordella did not meet the Condition of Participation Administrator Standard and he never served or functioned to meet the duties of Supervising Physician or Administrator for the Cape May County HHA. In fact, Dr. Tordella never showed up. Through its actions, the County and Cape VNA fraudulently induced the State of New Jersey to license the HHA, and fraudulently induced CMS to pay the County's Medicare claims, which the County then transferred by monthly check to Cape VNA. The HHA and its Medicare-linked bank account merely served as a conduit for CMS funds to be paid to Cape VNA. But for the fraud, the County would never have received NJ license application approval or CMS approval of the County's 855A enrollment application. It

is a crime under the New Jersey Criminal Code to knowingly make a false representation in connection with the negotiation, award, or performance of a government contract, such as the County's HHA's management contract. N.J.S.A. 2C:21-34.

111. Dr. Tordella, ostensibly in charge of overseeing the County Home Health Agency, communicated to Relator on May 12, 2016 that he resided in Florida for more than half the year. Essentially, the County had abdicated all authority and responsibility for its home health agency, and turned it over to Cape VNA. Cape VNA Chairwoman Joanne Carrocino confirmed to Relator on November 22, 2015, that Dr. Tordella did not function as either the County-employed Administrator or Supervising Physician and did not show up for either role during the six-year contract. Dr. Tordella's curriculum vitae also does not identify his having played any role with the County Home Health Agency at any time.

112. The County was a passive enrolled provider who had outsourced clinical, operational, managerial, and financial control of its Medicare home health agency to another entity which sub-contracted to another provider (its 50% joint venture co-owner), who operated the agency independently of the County. Such an arrangement is not a bona fide management agreement and under governing regulations qualifies as a Change of Ownership of the agency triggering obligations to provide notice to CMS. *See* 42 C.F.R. § 489.18; State Operations Manual (Pub. 100-07), § 3210.1.D.

113. Yet instead of providing required notice, the County of Cape May, obfuscated the transaction and, on the Medicare Enrollment Application, Section 4, categorized it as "adding a home health agency (HHA) branch" or "practice location," which according to the form obviates the need for a separate enrollment application. *See* Medicare Enrollment Application – Institutional Providers, CMS Form 855A, https://www.cms.gov/Medicare/CMS-

Forms/CMS-Forms/downloads/cms855a.pdf. The sham Management Agreement, false 855A Medicare Enrollment Application, failure to provide notice of a CHOW, and illegal sale/lease of billing number and billing privileges continued throughout the pendency of the Cape May County-Cape VNA contract until May 2016.

114. The County and Cape VNA furthered their fraudulent inducement of the New Jersey Department of Health by falsely seeking and obtaining accreditation from CHAP for the County HHA. The CHAP accreditation is for a three-year period of time. On May 14, 2015, CHAP re-accredited the County's Medicare Provider Number 31-7012, and recommended continued Medicare certification for three years. However, the CHAP letter was not written to the enrolled provider County, but to VNACJ, the purported sub-manager. Moreover, CHAP informed the VNACJ that "your organization" was granted full accreditation even though the VNACJ was neither the provider nor the entity managing and operating the home health agency. In fact, the County was the Medicare enrolled provider and the Cape VNA was operating the home health agency for its own account, and had a sham management agreement. VNACJ's deceptive efforts to seek accreditation of the County's agency with no County Administrator, County Governing Body or County employees, for services that Cape VNA was rendering, makes clear that VNACJ, Cape VNA, CRMC and the County all deceptively and fraudulently sought and obtained CHAP accreditation and Medicare certification. Upon information and belief, this occurred in both 2012 and again in 2015, and as detailed below the deception and fraud continued in 2016 by BAYADA and CHRCC. False and fraudulent Medicare certification in and of itself makes all claims submitted false under the FCA.

115. Medicare would not, and in fact could not, have made its payments if the Government knew that the County's Medicare home health agency claims that Cape VNA caused

to be submitted between July 2010 and May 2016 were false, that critical information was being concealed by omission from the Government, and the underlying contracts were induced by fraud, and the claims submitted were induced by kickbacks in violation of the AKS.

### *2. Cape Regional Medical Center and Visiting Nurse Association of Central New Jersey's Illegal Referral Arrangements and Violation of Medicare Regulations for Hospice Care*

116. CRMC and VNACJ doubled down on their 2010 fraudulent kickback scheme in October 2011, when their joint venture Cape VNA acquired a hospice agency, its Medicare Provider Agreement and State License.

117. VNACJ specialized in owning, managing, and operating home health and hospice agencies. Even though CRMC would split the profits or losses of the purchased hospice agency 50:50, VNACJ was responsible for all management and operational tasks. CRMC had no abilities, no skill-sets and therefore no responsibilities for the operation of the hospice agency. Its only substantive role was to refer its patients to the joint venture and to promote the agency to its affiliates and physicians.

118. CRMC was a referral source to the hospice agency in which it had a 50% ownership interest through Cape VNA.

119. The AKS prohibits any individual or entity from soliciting, receiving, offering, or paying any remuneration to induce or reward any person for referring, recommending or arranging for the purchase of any item or service for which payment may be made under a Federal health care program. 42 U.S.C. § 1320a-7b(b).

120. The opportunity for CRMC to invest and own 50% of the venture and opportunity to profit from its referrals to the joint venture's hospice agency is illegal anti-kickback remuneration. *See* October 6, 1997 OIG Advisory Opinion 97-5, page 10, *supra*, ¶ 71 for full quote.

121. Further, Cape VNA relocated the Hospice Agency to share offices with the County HHA, using the same service location address and phone number as the HHA, with the HHA and Hospice Agency sharing office, field, and back office employees, all of whom were employed by VNACJ. However, Medicare regulations require separately owned and separately enrolled providers each to have their own Administrator, Supervising Physician or Registered Nurse, and Governing Body. Cape VNA's 990 tax returns illustrate the commingling of income, expense, employment, operations, supervision and administration between the County of Cape May owned and enrolled Home Health Agency, and the Cape VNA owned and enrolled Hospice Agency. This arrangement is prohibited under Medicare regulations.

122. Moreover, Cape VNA fraudulently induced the New Jersey Department of Health to annually grant a license to its Hospice Agency by identifying Ellen Gusick as its Administrator. Gusick was employed by VNACJ, not Cape VNA - the owner and enrolled provider of the Hospice Agency. The CMS State Operations Manual Appendix M – Guidance to Surveyors: Hospice states that, "[a] qualified administrator appointed by and reporting to the governing body is responsible for the day-to-day operation of the hospice. The administrator must be a hospice employee and possess education and experience required by the hospice's governing body." (Interpretative Guidelines § 418.100(b)). Moreover, her office was in Red Bank, New Jersey in 2015, which is almost 100 miles from the Cape May Hospice Agency—too far away to supervise it on a daily basis.

123. The Government would not, and in fact could not, have made its payments if the Government knew that the County's hospice Medicare claims that Cape VNA caused to be submitted between October 2011 and May 2016 were false, that critical information was being

omitted from the Government, or that the underlying contracts were induced by fraud, and the claims submitted were induced by illegal kickbacks in violation of the AKS.

### *3. BAYADA and Cape Regional Medical Center's Illegal Referral Arrangements and Violation of Medicare Regulations*

124. In 2015, CRMC wished to replace its joint venture partner with BAYADA. After David Baiada convinced Joanne Carrocino to drop the Hospice Agency, CRMC and BAYADA submitted a joint bid to Cape May County on December 2, 2015 to run the County home health agency as a joint venture to be formed and called Cape Regional Home Health Care, LLC (CRHHC). Along with his BAYADA colleagues and CRMC employees, Mr. Freedman was involved in preparing the bid paperwork for the ultimately-winning bid and his name was on the front page of the bid proposal.

125. On May 23, 2016, BAYADA and CRMC created CRHCC, into which they each invested $300,000; profits and losses were to be split 50:50. BAYADA entered into a management services agreement with the joint venture for which it would receive 16.4% of revenue for providing all management services and day-to-day operations. Thus, unlike the Cape VNA joint venture, CRMC did not even pretend to have a role in the management and operation of the CRHHC joint venture with BAYADA. Rather, its only role under its joint venture with BAYADA was to refer its patients to the joint venture and to promote the agency to its discharge planners, its affiliates and its physicians.

126. Based on BAYADA's own financial projections from May 2016, BAYADA was projecting its joint venture with CRMC to generate annual revenue of over $4 million in 2018 and annual net income of 11.6%. Thus, the projected net income for 2018 alone was $470,612—meaning that after the first three years, BAYADA was projecting that CRMC would have been repaid its initial $300,000 investment. Over a five-year period, even assuming that years four and

five would stay flat and not experience the 30% growth that BAYADA had projected from 2017 to 2018, that would mean that BAYADA projected that CRMC would receive a net profit of $500,000 on its initial $300,000 investment. CRMC was projected to earn *an annual* return of over $200,000 by year 3.

127. Of course, based on the joint venture's management agreement, CRMC had absolutely no role in operating the joint venture. CRMC contracted away all administrative responsibility to BAYADA. Thus, CRMC's only way to impact the generation of this revenue was to refer patients to its joint venture with BAYADA. David Baiada communicated directly with Ms. Carrocino (the CRMC CEO) about the volume of CRMC's referrals being the key to the joint venture's profitability.

128. David Baiada saw the joint venture as an opportunity to obtain market share at the expense of Holy Redeemer, a competitor in the $6 million home health Medicare market in Cape May County. In an October 9, 2015 email, David Baiada recounted to Mr. Bellomy and others at BAYADA (and forwarded by David Baiada to Mr. Freedman on October 11, 2015) a call he had just had with Ms. Carrocino. Based on that call, Mr. Baiada stated that "this should easily be a $4m business"—confirming the $4 million annual income that BAYADA projects as discussed above.

129. On November 10, 2015, Mr. Freedman e-mailed David Baiada with concerns about the CRMC joint venture. Mr. Freedman stated that arrangement was the product of "bad compliance and bad lawyering." In response, David Baiada questioned whether Mr. Freedman was "over engineering this" and admitted to Mr. Freedman that he was interested in partnering with Ms. Carrocino only because she controlled the CRMC referrals. Specifically, on November 10, 2015, David Baiada wrote to Mr. Freedman in response to Mr. Freedman's concerns

about the "bad compliance" associated with the County's request for proposal, "I only want to do it if Joanne is our partner – she controls the volume." Standing alone, this is a classic smoking gun—documenting BAYADA's desire to partner with Ms. Carrocino because she could control the volume of CRMC referrals that would be critical for the CRMC-BAYADA joint venture to be profitable and successful.

130. However, the context for that admission is even more explosive. In an October 2, 2015 email to Ms. Carrocino attached in the October 9, 2015 email chain, David Baiada speaks of the very "volume" issue he refers to in the November 10, 2015 email: "**Volume** – The agency is not growing, which means it's not taking market share from Holy Redeemer. **Given your insight that there is improved capture of the Cape Regional discharges,** I suspect there's a big missed opportunity with SNFs (market data we have that shows that over 50% of SNF referrals go to HR.)" (Emphasis added.) Mr. Baiada then returns to the need for CRMC to increase the volume of referrals when he states later in the same email: "the home health side should not lose money at 90-100 patients, **but the real key is volume**, particularly with hospice, where break-even is about 25 and consistent profitability requires 30-40." (Emphasis added.) Indeed, his straightforward advice to Ms. Carrocino was to drop the hospice business altogether because it "is much more competitive" and instead "to focus on home health".

131. This email is thus another smoking gun. *Ms. Carrocino sold David Baiada* on the fact that the joint venture's capture of CMRC discharges could improve (i.e., she could help control the volume). And given Ms. Carrocino's ability to impact the volume of CRMC's home health referrals to the joint venture in a less competitive environment, this string of emails provides the context for David Baiada's subsequent November 10, 2015 email ("I only want to do it if **Joanne is our partner – she controls the volume**"). This was not simply David Baiada's internal

assessment—he was clear in his direct communications with Ms. Carrocino that the real key to the joint venture's profitability was **volume** and the ability to **improve the capture of the Cape Regional discharges**. Ms. Carrocino and Mr. Baiada both knew what needed to happen for the joint venture to be profitable (CRMC needed to refer more patients to it), and thus Mr. Baiada did not want to invest in a joint venture without partnering with Ms. Carrocino (who controlled that volume).

132. On November 18, 2015, Mr. Freedman e-mailed Mr. Baiada and Ms. Carrocino and questioned whether Dr. Tordella was actually serving as a County-employed, Medicare qualified administrator, as required by the Medicare Conditions for Participation 484.14 (b) and (c). Mr. Freedman stated, "[i]t's not clear to me if and how he is an employee of the County at this time. My hunch is that he is a retired snow bird." In response, on November 19, 2015, Mr. Baiada warned Mr. Freedman to "chill with the long and granular e-mails" to Ms. Carrocino.

133. Mr. Freedman warned David Baiada in a November 20, 2015 email that CRMC's 50% share of profit in exchange for no involvement beyond referrals represented a compliance problem because it violated the AKS. David Baiada responded that there allegedly had been "plenty of legal review" and that the VNACJ, who he understood to have utilized a similar joint venture arrangement, likely had performed legal review, suggesting that BAYADA need not independently satisfy itself that its arrangement was legal.

134. Unwilling to accept David Baiada's casual acceptance of an obviously fraudulent arrangement, Mr. Freedman explained to David Baiada further via a November 23, 2015 email in response to his question about the VNACJ arrangement with CRMC that the proposed BAYADA and CRMC transaction would not qualify for the relevant AKS Safe Harbor, which requires that joint ventures in which one partner is a source of referrals limit the referral

source's ownership to 40%. *See* 42 C.F.R. § 1001.952(a)(2). And for the same reason, Mr. Freedman told Mr. Baiada, "the appropriate question" was not whether the Cape VNA joint venture was blessed by a legal review, but instead "I think that the question is … Is the VNAC[J]/CRMC JV transaction compliant with CoP and NJ Licensing Standards for HHAs? I believe the answer is no."

135. As Mr. Freedman informed Mr. Baiada in the November 23, 2015 email, "I have done homework on this because my instinct has been and is telling me the bid paradigm and proposed 'management' agreement premise doesn't pass the smell test." In questioning the County's bid, Mr. Freedman expressed concern that the County "want[s] to be passive and paper over their obligations as owner. It is a net lease of those assets and not a management agreement. We are operating their agency for our economic benefit. We are not managing it for them and for their economic benefit." Mr. Freedman further questioned "CRMC's role as a member of a JV that is net leasing a provider agreement, provider number, bank account as a conduit for funds, CON and a State License who is not able to contribute operating value or expertise to the HHA but in the position to obtain economic benefit if referrals from their hospital increase …."

136. Mr. Freedman clearly and explicitly advised Mr. Baiada in this email:

> I do not believe that **there is a compliant JV owner role for CRMC because they have no experience in operating a home health agency and are in the position to influence referrals. We would be limited to a revenue cap of 40% from them under the <u>small investor safe harbor rule ("60/40") of Anti-Kickback per the OIG's 1989 Special Fraud Alert</u>. Plus, CRMC's role has no business purpose other than to profit indirectly from the business generated from the hospital. This is prohibited remuneration. We wouldn't offer a 50% (or 40%) interest in a JV to manage the County's agency to an entity that was not in the position to influence referrals.**

137. Furthermore, just as with Cape VNA, the proposed CRMC/BAYADA joint bid to the County amounted to a sale/lease of the Medicare billing number and billing privileges, violating the express condition for Medicare Payment. *See* 42 C.F.R. § 424.550. On November

23, 2015, Mr. Freedman notified BAYADA's Chief Compliance Officer Linda Pilla of his belief that the CRMC joint venture violated the AKS and, notified her on November 24, 2015 specifically that he believed 424.550(a) applied and made the Cape May request for proposal, bid and transaction non-compliant and illegal.

138. Additionally, because the County had essentially relinquished all authority and responsibility to the joint venture and BAYADA, the transaction violated Medicare Conditions of Participation prohibiting the delegation of administrative and supervisory functions. The transaction constituted a Change of Ownership because all Medicare & Medicaid revenue was assigned to the joint venture with a different taxpayer ID. As Cape May County had previously done in 2010, they also obfuscated the reality of the transaction and dishonestly described it as a management agreement on the 855A Enrollment Application (prepared by Jen Joana of BAYADA) it submitted, when in fact, Cape Regional Medical Center, BAYADA, and Cape Regional Home Health Care LLC all knew it was not.

139. Indeed, on November 25, 2015, David Baiada and Joanne Carrocino even explored (with Mr. Freedman) the possibility of alternative deal structures, demonstrating their knowledge of the noncompliant nature of the arrangement, but both ultimately approved the illegal arrangement anyway. Mr. Freedman had even prepared a revised, compliant bid page. Ms. Carrocino and Mr. Baiada, rejected Mr. Freedman's suggestion of bidding a compliant management fee paid **by** the County as is typical, rather than a percentage of the revenue paid **to** the County, for use of its provider agreement, billing privileges and state license, which the County sought in its non-compliant request for proposal on October 28, 2015. There was no financial agency relationship between the agent manager and the principal owner as the County was paid off the top regardless of the financial results of the agency. The so-called manager was managing

(the County agency) in its own financial interest and for its own account, which is not a management agreement relationship.

140. Mr. Freedman informed Baiada on November 25, 2015 that "[m]ost likely, we won't have any competition on a compliant management transaction because others probably won't address it. But, the County may be obligated to bid it right and then we would have the CRMC relationship hook to win. Everyone would have to bid a FMV MSA fee and document it. Or maybe it supports [the County] to sell the agency & license when they realize they can't net lease it out." Ms. Carrocino was so intent on not losing the opportunity to continue to control the County HHA and be profitable as David Baiada advised her on October 2, 2015 that she pretended away any illegal conduct, simply assuring Mr. Freedman and Mr. Baiada on November 25, 2015, that "[e]veryone is in agreement that we must comply with all laws." In fact, in the same email Ms. Carrocino wrote that CRMC's attorney Tony Monzo spoke with the County's attorney James Arsenault, and the County agreed that the CRMC/BAYADA proposal could state that it is "subject to CMS approval and compliance with all other applicable laws." Of course, the County bid package also required that the bids comply with all federal and state laws, which obligated the bidders to ensure that their bids actually complied—not just a fake and false representation by the hospital CEO to promise to agree to comply with all laws. Ms. Carrocino additionally advised Mr. Freedman on November 25, 2015 as follows: "David, I can assure you that we are not going with option 2 or 3 at the 11th hour on Tuesday afternoon. **The County attorney has provided his direction <u>which we should follow</u>**." (Emphasis added.)

141. In response to Mr. Freedman's concerns about the legality of the Cape May transaction, on November 25, 2015, BAYADA's compliance counsel prepared a compliance memo, which has been withheld on the basis of attorney-client privilege. On November 30, 2015,

CRMC attorney Tony Monzo produced a memo that responded to and attempted to rebut the BAYADA November 25, 2015 Compliance memo. Mr. Monzo concluded his memo by stating, "I would therefore recommend that the proposal be submitted subject to confirmation of compliance with the conditions of participation of CMS and the licensing approval of DHSS, as well as compliance with the Federal Anti-Kickback Statute…"

142. On December 31, 2015, BAYADA's outside counsel, Archer & Greiner, authored a Compliance Review Memorandum dated December 29, 2015.

143. On January 6, 2016, Plaintiff e-mailed Daivd Baiada and objected that the CRMC joint venture "is a black and white compliance violation, not gray," because, among other reasons, Cape May County did not employ a qualified administrator to oversee the home health agency, as required by the Medicare Condition of Participation, 42 C.F.R. § 484.14.

144. On January 12, 2016 in response to a request by Chief Compliance Officer Linda Pilla, BAYADA's outside counsel, Archer & Greiner, revised the December 29, 2015, memorandum regarding "Review of Cape May County RFP/Joint Venture Compliance Issues" (the "Archer Compliance Review Memorandum").[1] Pilla and Compliance Counsel Kelli Marans, Esq., who is sister to David Baiada, and daughter to Mark Baiada, intended to have the revised Archer Compliance Review Memorandum delivered to Arsenault so that BAYADA was transparent and met the joint venture's December 2, 2015 bid contingency and the October 28, 2015 public bid specifications. BAYADA provided the revised Archer Compliance Review Memorandum to Joanne Carrocino and CRMC counsel Tony Monzo on the morning of January 13, 2016 and requested that Mr. Monzo share it with County Counsel James Arsenault. Intent on continuing to control the County HHA and not exposing the non-compliance by Cape VNA during

[1] The Department of Justice has cleared the 1/13/16 revised version of the Archer Compliance Review Memorandum as not being protected by the attorney-client privilege.

the past five years which could mean liability for CRMC and would contradict the November 30, 2015 Monzo Memo, Mr. Monzo intentionally and knowingly chose to conceal the Archer Compliance Review Memorandum from the County counsel and anyone at the County.

145. In the Archer Compliance Review Memorandum, attorney Robert Fogg concludes as follows:

> Based on my review of [11 listed documents, including Cape VNA transaction materials and submissions] and applicable regulations, I would advise you that [sic] and management agreement with County of Cape May and potentially the proposed joint venture arrangement each pose compliance risks to the County of Cape May, as licensees, as well as to the joint venture partners, Bayada Home Health and Cape Regional Medical Center. There are three areas of concern – [1)] regulatory compliance with Medicare Conditions of Participation and state NJ DOH licensing regulations; 2) compliance with NJ DOH Transfer of Ownership requirements, and 3) compliance with federal antikickback law related to the JV Entity's structure.

146. BAYADA, CRMC and the County failed to revise the joint venture structure or the County "Management Agreement" to address and honestly resolve the compliance risks and concerns raised by Mr. Freedman and the January 13, 2016 modified version of the Archer Compliance Review Memorandum. Instead, on January 26, 2016, Joanne Carrocino and David Baiada knowingly signed the non-compliant, purported (but sham) "Management Agreement" contract with Cape May County under the illegal arrangement, thereby violating the Anti-Kickback Statute and other applicable Medicare Regulations, including an express prohibition under the Conditions for Medicare Payment.

147. The County of Cape May and Cape Regional Home Health Care also fraudulently induced the State of New Jersey Department of Health in the same way that Cape VNA had done before it. On March 2, 2016, County of Cape May Counsel Arsenault sent a letter to the New Jersey Department of Health to obtain approval of the Cape VNA CN-7 license application. In his letter, Mr. Arsenault falsely stated, "Dr. Tordella served as the agency

administrator under the expiring contract, and will remain in that position during the successor agreement."

148. The County knew that this statement was false, and fraudulently induced the New Jersey Department of Health into relying on their statement. If the County had been truthful, it would not have received a waiver or approval of their CN-7 license application and could not have proceeded with their transaction. In the County's November 13, 2015 formal Q&A response as part of the bidding process, the County stated, "Dr. Joseph Tordella, D.O. and Kevin Thomas have historically **only** sat on the Home Care professional advisory committee." (Emphasis added.) Ms. Carrocino, the County VNACJ CEO and Chair of the Cape VNA Board of Trustees for six years, confirmed this fact in an email to Relator on November 22, 2015. Specifically, in an email to her, Relator asked: "Based on your experience in being a 50% owner of the JV that is operating/managing the agency through VNAHG, what involvement has Dr. Joe Tordella had in the administrative and supervisory functions of the HHA over the past 5.5 years? If any." In response to this question, Ms. Carrocino responded: "The **only** involvement Dr. Tordella has had is sitting on the professional advisory committee." (Emphasis added.)

149. The CMS State Operations Manual Interpretive Guidelines 484.14(c) Tag G133 provides that the Administrator must be responsible for directing the agency's ongoing functions, maintaining liaisons among the governing body and professional staff, and overseeing day-to-day operations of the HHA. Dr. Tordella never fulfilled these responsibilities or even showed up, and the Cape Regional Home Health Care joint venture fraudulently induced the New Jersey Department of Health into relying on the false statement that he had in the past and that he would in the future. Had the New Jersey Department of Health and CMS known that Cape May County did not have a compliant Administrator in place who would actually show up,

they never would have issued a license to Cape May County dba Cape Regional Home Health Care, LLC, 100% owned and controlled by CRMC and BAYADA.

150. On March 21, 2016, Mr. Arsenault wrote to John Calabria of the New Jersey Department of Health and explained "that Cape May County's planned management agreement … is similar if not identical to the County's management agreement from 2010 through the present with Cape Visiting Nurse Association, Inc." The County and CRMC knew that if the New Jersey Department of Health determined that the 2016 representation was false and non-compliant, that the same would be true of the Cape VNA representation and submission of claims from 2010 to 2016. Thus, the County and CRMC were doubly motivated to conceal by omission the non-compliance of the BAYADA and CRMC bid from the State of New Jersey, Department of Health, Facilities Licensing Department. *See United States ex rel. Forcier v. Computer Sciences Corp.*, 12 Civ. 1750 (DAB), 2017 WL 3616665, at *11 (S.D.N.Y. Aug. 10, 2017) (denying motion to dismiss FCA claim and finding, "[t]he fact that the enrollment application specifically inquired about applicants' fee arrangements—and the fact that Defendant elected to omit mention of the incentive payment provisions in its response—shows that Defendant was likely aware that full disclosure could affect the State's approval decision.").

151. On April 11, 2016, Mr. Freedman wrote to David Baiada and Chief Strategic Growth Officer Greg Bellomy and repeated that the structure BAYADA had agreed to with CRMC and the County "was non-compliant and we've known that since last November" and urged a "plan B to create a compliant MSA or acquire the agency." On April 11, 2016, Mr. Freedman also objected to Mr. Baiada that Cape May County "labeling the publicly bid contract [for home health services] a 'Management Agreement' was and is a sham," because the County was shifting total control to the Bayada-CRMC joint venture in violation of the Conditions of

Participation and Condition for Medicare Payment. Mr. Freedman pointed-out "potential anti-kickback liability" and stated "we ought not be putting the County in the position where they are violating a variety of the Conditions of Participation." Plaintiff stated, "I believe that if we become [the County's] so-called manager, we have a fiduciary duty to tell them they are out of compliance."

152. On May 9, 2016, Mr. Freedman again objected to David Baiada that the Bayada-CRMC joint venture violated the Anti-Kickback Statute and Medicare Conditions of Participation.

153. On May 12, 2016, Mr. Freedman reiterated concerns about Dr. Tordella to Messrs. Bellomy and Parish, Division Director of Hospital Managed Services. Plaintiff stated in an e-mail that Dr. Tordella was "back and forth to Florida weekly" and was not a Medicare enrolled physician. Mr. Freedman stated, "[h]ow he is qualified to be an Administrator is beyond me."

154. The County HHA and the County Medicare-linked bank account merely served as a conduit for CMS funds to be paid to BAYADA. On June 15, 2016, Gerald Thornton, a Cape May County Freeholder Director, signed the CMS-588 Electronic Funds Transfer Authorization Agreement falsely certifying that the Provider (the County) was the account holder and that it had "sole control of the account," when in fact as of January 26, 2016 (amended May 23, 2016) it had agreed to assign 100% of the Medicare funds it received to BAYADA (as it had previously done for the Cape VNA).

155. The Government would not, and in fact could not, have made its payments if the Government knew that the County's Medicare claims that BAYADA caused to be submitted between June 2016 and the present were and continue to be false, that critical information was being concealed by omission from the Government, and that the underlying contracts were induced

by fraudulent representations and the referral source hospital was receiving illegal remuneration for its referrals in violation of the AKS.

156. Ms. Carrocino's emails on November 25, 2015 were false. She had no intention to "follow all laws". Mr. Monzo's Memo on November 30, 2015 was false. He did not want to expose himself or his client CRMC to liability by seeking "confirmation of compliance with the conditions of participation of CMS and the licensing approval of DHSS, as well as compliance with the Federal Anti-Kickback Statute…" No one from CRMC or BAYADA ever went to the CMS Regional Office or NJ Department of Health or Community Health Accreditation Partner (CHAP) or to Medicare contractor NGS to specifically ask about the identified compliance issues raised by Mr. Freedman and the subsequent compliance memos.

**B. BAYADA's Illegal Joint Venture with MUSC Strategic Ventures**

157. Following the Cape May County transaction, as early as May 2016, BAYADA proposed forming yet another joint venture to buy patients. This time, BAYADA proposed a joint venture it would enter into with MUSC Strategic Ventures that relied on referrals from MUSC to own and operate home health agencies/offices in South Carolina. MUSC is South Carolina's only comprehensive academic medical center, and among other facilities operates a 750-bed medical center and physicians' practices. *See* http://www.muschealth.org/index.html. As described by the parties in an August 10, 2016 commitment letter agreement:

> BAYADA is proposing the creation of a joint venture with Medical University of South Carolina's MUSC Strategic Ventures. The purpose of the joint venture is to expand MUSC's capabilities to serve its patients in a nine county area (Tier 1- Charleston, Berkeley, and Dorchester Tier 2- Georgetown, Orangeburg, Beaufort, Horry, Colleton, and Florence) outside of its existing campuses. The scope of services to be provided within the joint venture are Medicare Certified Home Health and Hospice services.

Under the proposed arrangement, BAYADA would own 51% of the projected $30-million home health and hospice agencies' joint venture business and MSV would invest $245,000.00 and own

49% of the joint venture (exceeding the 40% limit in the AKS safe harbor for contractual joint ventures).

158. As described herein, BAYADA had a practice of targeting hospitals to do joint ventures specifically because hospitals discharge patients who make up a substantial referral base to home health agencies. Indeed, MUSC discharged patients worth approximately $20 million in Medicare referrals in the region to home health according to the 2014 Medicare data attached as part of Exhibit 3 to the commitment letter. The intent of the BAYADA HMS Division was to lock up referrals with referral source hospitals through a joint venture arrangement and to then make a profit from the management fees and co-ownership of the agency and to further reduce BAYADA's indirect corporate and direct back office overhead costs through allocations. According to an internal BAYADA press release, "… *Greg Bellomy, BAYADA's Chief Strategic Growth Officer and Senior Living ("SRL") Division Director, as well as BAYADA's HMS Division Director Brad Parrish, were instrumental in securing the opportunity for the joint venture with MUSC"*.

159. BAYADA did not need any investment of money from MUSC or MSV to fund a home health operation. Rather, BAYADA wanted MUSC's referrals (its post-acute home health and hospice patients) which is why BAYADA Hospital Managed Services Division representative Gerry Scrivener cold-called MUSC in the first place, and MUSC was willing to provide referrals in return for MSV to obtain a share of the ownership and profit of the new joint venture. The parties' intent is evidenced in part through a series of emails in August 2016 and in a commitment letter dated August 10, 2016 from Greg Bellomy of BAYADA to Patrick J. Cawley M.D., M.B.A., Executive Director/CEO Medical Center and VP for Clinical Operations, CEO,

MUSC Health (also known as MUSC Strategic Ventures), and Vice President for Health Affairs, MUSC.

160. On August 8, 2016, Mr. Bellomy wrote to Dr. Mark Lyles, MUSC's Chief Affiliations and Business Transformation Officer, and Sarah Bacik, Chief Strategy and Business Development Officer of MUSC Health (also known as MUSC Strategic Ventures), referring to his attached August 10, 2016 commitment letter, explaining that "we believe that between Home Health and Hospice, the JV could generate approximately $30M of revenues in the nine county area with Operating Income in the 8% - 10% range. The pace of achieving that will depend upon state approval for new offices, capital requirements and support from MUSC and affiliated hospitals." Dr. Mark Lyles, BAYADA's Chief Medical Officer Dr. Adam Groff, and David Baiada all went to graduate school together at the Wharton School of the University of Pennsylvania.

161. The August 10, 2016 commitment letter to Dr. Cawley outlined the prospective financial benefits of the joint venture, including a pro-forma budget for the new entity that was premised on MUSC's referrals of patients to the joint venture. In Exhibit 1 to the August 10, 2016 commitment letter, BAYADA projected revenue of $2,669,373 in year one (2017), $4,408,930 in year two (2018), and $4,973,128 in year three (2019). The offering of a 49% interest to MSV, its right to make a profit as a co-owner, and an infinite return on investment after year three (when all start-up capital will have been returned to MSV), only happened because MUSC has the ability to deliver referrals from its hospital system to the newly formed joint venture home health agency. Plus, MSV's 49% interest would presumably be worth approximately 49% of the growing revenue over the years. Thus, based on its projection of $4,973,128 in year three, the business would be worth about $5 million and MSV would own an interest worth approximately

$2.45 million (49%) on an investment of some $245,000; in other words, a 1000% return in three years. The future value of the business was and is substantial remuneration being offered in exchange for referrals, confirming the intent of the parties on August 10, 2016.

162. To induce Dr. Cawley, MUSC and MSV into the joint venture transaction, Messrs. Bellomy and Parrish intentionally removed the first three months of the BAYADA CFO's projections which added over $1,218,605 in revenue and $265,656 in operating income to the three-year fraudulent projection BAYADA shared with MSV. The altered projections were intended to induce referral source MUSC into the transaction by falsely projecting how quickly MSV would be repaid on its investment. In other words, BAYADA was so desperate to buy MUSC's patients, that illegally offering "something of value" to induce MUSC into an illegal AKS referral arrangement with it was not enough. To make its illegal offer even more enticing, Messrs. Bellomy and Parrish (whose profit-sharing was dependent on this deal) intentionally manipulated the value of what BAYADA was offering to make the joint venture opportunity for MSV appear even more lucrative than it really was. BAYADA colleagues Richard Hobson, Mike Johnson and Melinda Phillips said nothing about the manipulation and deception, perhaps because they would get a cut of the profit sharing as well.

163. Mr. Freedman objected to BAYADA defrauding MUSC. On August 7, 2016, Mr. Freedman e-mailed Mr. Bellomy that the financial projections BAYADA intended to submit to MUSC "don't make sense to me" and stated that the numbers were "[t]oo much, too fast."

164. On August 10, 2016, Mr. Freedman questioned Mr. Bellomy on whether MUSC's doctors and discharge planners would stop referring patients to established competitors and whether his financial projections were realistic. Mr. Bellomy's August 10 response to

Freedman revealed the intention to violate the AKS: "Specific to the volume issue, I have been **very clear** with [Dr.] Mark [Lyles] and Sarah [Bacik] that **we have to achieve a certain census in order for this to be viable**. They are **confident** that **they can deliver the referrals**." (Emphasis added.)

165. On August 12, 2016, Mr. Freedman provided Mr. Bellomy with market data showing comparable start-up ventures by BAYADA in markets (New Jersey and Maryland) where BAYADA was already established, unlike in South Carolina. Mr. Freedman provided this data to Mr. Bellomy to show that the fraudulent financial projections BAYADA gave to MUSC were knowingly false. In fact, the projections showed revenue that was more than two-times higher than the revenue BAYADA generated in similar ventures in established markets. Mr. Freedman ended his e-mail by warning that BAYADA needed to "budget accurately for early year cash flow losses."

166. Mr. Bellomy's August 12, 2016 response again makes clear BAYADA's intent to induce illegal referrals from MUSC officials in violation of the AKS: "The 7 agencies that serve Charleston received $8M of business from MUSC, I am confident we can capture 25% of that. **The [MUSC] Case Management team as well as the CEO and CMO have been part of every discussion. This is going to be fine**." (Emphasis added.) Getting the MUSC management team on board was essential so that BAYADA could be assured of the referrals as BAYADA's mission was to buy the MUSC patients for its home health business so BAYADA could obtain a CON, a license and a Medicare provider agreement and expand into South Carolina.

167. On August 18, 2016, Mr. Freedman e-mailed Mr. Bellomy warning him to "[b]e careful" because an appraiser would be doing its own financial projections for the MUSC deal, which would be "substantially different" from BAYADA's fraudulent projections.

168. The BAYADA joint venture with MSV that was agreed upon in concept in August 2016 was formalized in November 2016 (after Relator had been discharged by BAYADA) and implemented January 1, 2017. The joint venture has two offices open so far – one in Mount Pleasant and one in Conway. The two offices are licensed in five South Carolina counties: Berkeley, Charleston, Dorchester, Georgetown, and Horry.

169. Because MUSC is not permitted to form a joint venture under the South Carolina constitution, MUSC caused MUSC Strategic Ventures (a South Carolina tax-exempt corporation, formed on September 2, 2015) and BAYADA to form SCHHA LLC, a Delaware LLC (dba MUSC Health at Home, By BAYADA) on November 22, 2016 to own and operate the South Carolina home health agencies/offices. MSV is a 49% member in the joint venture, and BAYADA Home Care (a Hawaii 501c(3) non-profit corporation, formed on February 20, 2015) is a 51% member. The LLC entity is an empty shell conduit that owns the Medicare provider numbers, Certificates of Need, and the South Carolina home care licenses. All operational, clinical, managerial and financial support systems will be and have been provided by BAYADA via a Management Agreement. Neither MSV nor MUSC have a meaningful day-to-day HHA operating role and neither has HHA operating experience.

170. BAYADA placed its LLC ownership interest in the South Carolina home health care agency offices into a purportedly independent Hawaii tax exempt entity (which is supposed to benefit Hawaii residents) because MUSC and MSV wanted a tax-exempt partner.

171. BAYADA Home Health Care, Inc. has a management agreement to manage both BAYADA Home Care (Hawaii) and MUSC Health at Home, by BAYADA (the dba for SCHHA, LLC).

172. Because MUSC caused private entity MSV to form the joint venture with BAYADA, MSV is liable for the joint venture's AKS violations: BAYADA intended to provide, has provided, and is providing remuneration (something of value) to MSV in return for arranging referrals from MUSC as evidenced by the facts and the HHS-OIG's interpretation of the AKS. The arrangement does not satisfy any of the elements of the AKS safe harbor (including because MSV has a greater than 40% ownership interest). *See generally* discussion of HHS-OIG guidance *supra*.

173. Put another way, on August 10, 2016, BAYADA offered MSV the opportunity to invest in a low-cost, low-risk, high-projected-return investment in exchange for arranging for MUSC to deliver referrals to the joint venture; indeed, MUSC can substantially impact or control the joint venture's revenue by its willingness to steer referrals to the joint venture.

174. MSV's participation in the joint venture was intentional, and approved by MSV's board of directors. Bellomy wrote to Freedman on August 8, 2016, stating the following:

> Spoke to Mark [Lyles] and learned the following:
>
> - The MUSC Ventures Board Meeting has been moved to Wednesday, so we need to finalize our document today.
> - MUSC Ventures is a new entity that hasn't been funded yet, so lower capital requirements over the next 60 days the better.

Therefore, MUSC Strategic Ventures knowingly entered into the joint venture to facilitate an illegal kick-back scheme that was dependent on MUSC's patient referrals.

175. As further remuneration in return for referrals, BAYADA also held out to its potential joint venture partner the possibility that "once the JV is operational, BAYADA would consider providing the additional funding to support the growth with appropriate protections and reasonable interest, and/or securing a separate line of credit for the JV. These are outside of the

scope of this document, but are things you should be aware that we are discussing internally." *See* August 8, 2016 email *supra* from Greg Bellomy of Bayada to Mark Lyles and Sarah Bacik.

176. The 1989 (reprinted in 1994) and 2003 HHS-OIG alerts/advisories, supra, address AKS suspect joint ventures where one owner has the ability to refer, farms out the day-to-day operations to a contract manager, forms a shell entity, and allows the referral source to share in the profits. They speak directly to the suspect arrangements:

- Investors are chosen because they are in position to make referrals
- One of the parties may be an ongoing entity already engaged in a particular line of business
- Amount of capital invested by the referral source may be disproportionally small and returns on investment may be disproportionally large when compared to a typical investment in a new business enterprise
- Investors may be paid extraordinary returns on the investment in comparison with the risk involved
- The Owner contracts out substantially the entire operation to the Manager – otherwise a potential competitor- receiving in return the profits of the business as remuneration for its federal program referrals
- Owner expands into a related line of business, which is dependent on referrals from, the Owners existing business
- While the contract terms of these arrangements may appear to place the Owner at financial risk, the Owner's actual business risk is minimal because of the Owner's ability to influence substantial referrals to the new business
- The Owner and the Manager share in the economic benefit of the Owner's new business
- Aggregate payments to the Manager typically very with the value or volume of business generated for the new business by the Owner
- Expand into a health care service that can be provided to the Owner's existing patients
- The newly-created business predominantly serves the Owner's existing patient base (or patients under the control or influence of the Owner)
- The Owner's primary contribution to the business is referrals, it makes little financial investment in the business, delegating the entire operation to the Manager, while retaining profits from its captive referral base
- The Manager provides all of the following key services: day to day management, billing services, equipment, personnel and related services, office space, training, health care items, supplies and services – in general, the greater the scope of

services provided by the Manager, the greater the likelihood that the arrangement is a contractual joint venture.

- Remuneration – The practical effect of the arrangement viewed in its entirety, is to provide the owner the opportunity to bill insurers and patients for business otherwise provided by the Manager. The remuneration from the venture to the Owner (i.e., the profits of the venture) takes into account the value and volume of the business the owner generates.

177. HHS-OIG Advisory Opinions discussed *supra*, are directly on point with respect to the Bayada/MUSC/MSV arrangement. For example, in Advisory Opinion No. 11-15 (October 3, 2011), *supra*, the OIG noted that "The proposed arrangement appears to have no business purpose other than to permit the **physician** investors to profit from the business they generate for the **Path Lab** in the form of **their laboratory specimen** referrals." (at p. 6, emphasis added). If one replaces the bolded words in the prior sentence of the Opinion with the operative words from the Bayada/MSV joint venture arrangement, one gets a sentence with an analogous situation and result: "The proposed arrangement appears to have no business purpose other than to permit the **MUSC Strategic Ventures** investors to profit from the business they generate for the **Home Health Agency** in the form of **the MUSC home health agency** referrals."

178. The Government would not, and in fact could not, have paid the claims if the Government knew that the Medicare claims that BAYADA caused to be submitted for the joint venture starting in January 2017 and continuing to the present were and continue to be false, or that the underlying contracts were induced by fraudulent financial projections, and the promise of illegal remuneration kickbacks to induce referrals in violation of the AKS.

## C. Harm to the Government: Damages and Penalties

179. The schemes described above taint subsequent claims for services billed by the FCA Defendants or caused to be billed by the FCA Defendants to Medicaid and Medicare and other Government Health Care Programs.

180. The Government's damages include the approximately $24 million in claims submitted by BAYADA and Cape Regional Home Health Care in the name of Cape May County tainted by illegally induced referrals from CRMC and ongoing violation of Medicare regulations.

181. BAYADA's illegal arrangements with MUSC and MSV have resulted in an estimated $26 million of false or fraudulent claims for payment from January 2017 to date, and continuing.

182. The Government's damages also include approximately $9.6 million (from July 2010 through May 2016) billed by Cape VNA in the name of Cape May County during the pendency of Cape VNA's contract with Cape May County, tainted by illegally induced referrals from CRMC and violation of Medicare regulations.

183. Finally, the Government's damages include approximately $3.089 million of false or fraudulent claims for payments from October 2011-May 2016 submitted by CRMC and VNACJ tainted by the illegal arrangements in their hospice agency which the joint venture acquired in October 2011.

### D. BAYADA Discharged Relator in Retaliation for His Protests of BAYADA's Illegal Conduct.

184. Mr. Freedman reasonably believed that BAYADA's transactions with CRMC and Cape May County violated the AKS and governing Medicare regulations and repeatedly advised his supervisors David Baiada and Greg Bellomy, as well as numerous BAYADA colleagues, and the Compliance Office of his objections from November 2015 through May 2016, as set forth above. Mr. Freedman also reported his objections to CRMC CEO Joanne Carrocino during this time period.

185. Mr. Freedman also reasonably believed that the financial projections BAYADA submitted to MUSC were fraudulent and intended to deceive and he repeatedly advised BAYADA of his objections to the false financial projections.

186. In addition, BAYADA had a joint venture with Inspira. Similar to its actions with MUSC, BAYADA and, specifically, Greg Bellomy, presented knowingly false and misleading budget projections to Inspira on April 27, 2016 in connection with the joint venture. Mr. Freedman objected to this fraudulent activity.

187. On April 27, 2016, Mr. Freedman objected to Mr. Bellomy that he was "surprised" by the financial projections Mr. Bellomy sent to Inspira. Mr. Freedman told Mr. Bellomy, "I am advocating for us telling the truth instead of us risking that [Inspira] catches it, which puts … everyone's credibility in a compromised position."

188. On April 27, 2016, Mr. Freedman also told members of the BAYADA team working on the Inspira joint venture that he was "not a believer in winging it and praying that we don't get caught. I much prefer the facts communicated honesty with intellectual integrity." Mr. Freedman stated that he "did advise Greg [Bellomy] very clearly in writing that we needed to fix the budget" presented to Inspira to make sure that it "tied to reality and to the recent valuation numbers we gave the appraiser," but that Mr. Bellomy "ignored" Mr. Freedman.

189. On April 28, 2016, Mr. Freedman e-mailed Mr. Bellomy again stating, "I don't like this whole budget situation" and "I think we ought to fix it before go-live." Mr. Bellomy responded by stating, "I vote for letting sleeping dogs lie."

190. On May 1, 2016, Mr. Freedman e-mailed Mr. Bellomy regarding the Inspira budget stating that he spent the whole weekend "getting this straight." Mr. Freedman concluded

his e-mail by stating, "I am strongly recommending that we fix everything ASAP" and "tell it to them [Inspira] straight."

191. On May 5, 2016, Mr. Freedman e-mailed Mr. Bellomy stating, "[a]gain, please focus on fixing the [Inspira] budget. Deb and I are not comfortable inserting [the CEO, Mark Baiada's] signature pages into the Contribution Agreement when we know the budget has meaningful errors."

192. On May 5, 2016, Mr. Freedman also e-mailed Mr. Bellomy and Mark Baiada, among others, stating that "ethically," senior leadership at BAYADA "would never expect any of us to give [Inspira] a knowingly erroneous and misleading budget as part of the basis of us signing legal binding agreements." In response, Mr. Baiada tried to tamp down Mr. Freedman's objections by stating, "since when are you responsible for decisions on budgets?"

193. Mr. Freedman responded to Mr. Baiada on May 5, 2016 by stating that the Inspira budget "was so far off from what the appraiser projected and what our last four quarters actuals support … that it did not make sense." Mr. Freedman stated that the budget "has no basis in reality" and BAYADA would "likely vary from it by more than 10%." Mr. Freedman stated "I had strongly recommended to [Mr. Bellomy] that we not present an erroneous budget last Monday, but he did it anyway." Mr. Freedman concluded by stating, "we didn't think [the CEO, Mark Baiada] would appreciate us slipping his signature into agreements when we know the presented budget is erroneous and misleading."

194. Mr. Freedman's objections to the CRMC scheme and to the fraudulent budget and financial projections BAYADA submitted to MUSC and Inspira, went unheeded. Instead, his objections were followed by a pattern of antagonism that ultimately resulted in his firing on August 22, 2016.

195. The antagonism started almost immediately with comments from David Baiada aimed at trying to get Mr. Freedman to back-off his objections to the CRMC joint venture. This included Mr. Baiada warning Mr. Freedman on November 10, 2015 not to "over engineer" the CRMC deal, and on November 19, 2013 to "chill with the long and granular e-mails" to CRMC about his concerns. It also included Mr. Baiada warning Mr. Freedman on November 23, 2015 not to give "that feedback" to CRMC regarding Mr. Freedman's objection that the Bayada-CRMC joint venture violated the AKS.

196. Then, on January 28, 2016, after Mr. Freedman would not back-off his concerns, BAYADA informed Mr. Freedman he was effectively being taken-off the CRMC joint venture and replaced by Brad Parrish, Division Director, who had not even started working at Bayada yet. This occurred only three weeks after Mr. Freedman's January 6, 2016 e-mail to David Baiada complaining that the CRMC joint venture was "a black and white compliance violation."

197. The next day, January 29, 2016, BAYADA's Chief Financial Officer. Tom Sibson, informed Mr. Freedman that his e-mails concerning the CRMC joint venture had been "causing a lot of stir and confusion" and that moving forward, there would be a "toll gate" in place and Mr. Freedman's e-mails would be vetted before anyone responded. This was nothing short of an attempt to silence Mr. Freedman.

198. The antagonism continued. On March 28, 2016, Mr. Bellomy again informed Mr. Freedman and others at BAYADA that Mr. Parrish, not Mr. Freedman, was taking "the lead" on the CMRC transaction.

199. On May 5, 2016, Mr. Bellomy sent an e-mail to Mr. Freedman and Mr. Parrish describing their job duties, i.e., "swim lanes" moving forward. The new "swim lanes" stripped away the majority of Mr. Freedman's duties and gave them to Mr. Parrish, who had only

been with Bayada for three months. This *de-facto* demotion occurred only three weeks after Mr. Freedman's April 11, 2016 e-mail to David Baiada objecting that the CRMC venture "was and is a sham" and that the "structure is non-compliant and we've known that since last November."

200. On June 9, 2016, one month after Mr. Freedman's objections to the fraudulent Inspira budget, David Baiada told Mr. Freedman that his "tour of duty" with BAYADA was over and that Mr. Freedman was being fired allegedly due to "team dynamics." Mr. Baiada provided no further explanation. The firing was rescinded the next day, also without explanation.

201. Finally, on August 22, 2016 - less than three months after Mr. Freedman's May 2016 objections to the CRMC scheme and fraudulent budget to Inspira, and only *two business days* after his August 18, 2016 objection to the MUSC scheme – BAYADA discharged Mr. Freedman from his position as Director of Strategic Growth permanently.

202. The discharge decision was communicated to Mr. Freedman by Mr. Bellomy, but it was made and/or approved by David Baiada in consultation with Mr. Bellomy.

203. BAYADA gave Mr. Freedman inconsistent reasons for his discharge. When David Baiada informed Mr. Freedman of his firing on June 9, 2016, Mr. Baiada alleged it was because of "team dynamics."

204. By August 22, 2016, that reason had changed. Mr. Bellomy told Mr. Freedman that the reason for his firing was that he allegedly did not follow directions on how to structure a responsive bid proposal for a collaboration with Dignity Health. That allegation is false. Mr. Baiada explicitly told Mr. Freedman in an e-mail dated August 18, 2016 that it was Mr. Freedman's "call" how to structure the proposed deal. Moreover, the structure that Mr. Freedman submitted was guided and approved by BAYADA's outside counsel.

205. The alleged reason for Mr. Freedman's discharge changed a third time when Mark Baiada, then the Chief Executive Officer of BAYADA, informed Mr. Freedman's brother that Mr. Freedman had been fired because he was allegedly not "diplomatic."

206. All of BAYADA's shifting reasons for discharging Mr. Freedman are pretextual. The real reason BAYADA discharged Mr. Freedman is in retaliation for his repeated objections to BAYADA's unlawful and fraudulent activity in connection with the CRMC and MUSC schemes, and the Inspira budget, including violations of public bidding laws, Medicare regulations, the AKS and the FCA.

207. Despite BAYADA's Compliance Program Standards of Honesty and Confidentiality, which legally bound BAYADA and all of its employees and independent contractors to follow all laws and regulations, a former BAYADA Director of Visit Regulatory and Quality Affairs Cindy Istvan, R.N., stated that "David Baiada plays Russian roulette with compliance."

## VIII. CLAIMS FOR RELIEF

**Count I**
**(Against Cape May Defendants)**
**Federal False Claims Act – False Claims**

**31 U.S.C. § 3729(a)(1)(A) (2009)**

208. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

209. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

210. By and through the acts described above, the Cape May Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, the County submitted, and continues to submit, claims to Medicare and other

Government Health Care Programs requesting payment for services provided to patients of CRMC. These claims were tainted, and thereby false because of illegal kickbacks which BAYADA provided to CRMC to induce CRMC to refer those patients to the joint venture that BAYADA and CRMC created to operate the County's supposed home health agency.

211. The Government, unaware of the falsity of all such claims made or caused to be made by the Cape May Defendants, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

212. By reason of the Cape May Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

213. Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

## Count II
## (Against Cape May Defendants)
## Federal False Claims Act – Conspiracy

**31 U.S.C. § 3729(a)(1)(C) (2009)**

214. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

215. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

216. By and through the acts described above, the Cape May Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, the County submitted, and continues to submit, claims to Medicare and other Government Health Care Programs requesting payment for services provided to patients of CRMC. These claims were tainted, and thereby false because of illegal kickbacks which BAYADA provided to CRMC to induce CRMC to refer those patients to the joint venture that

BAYADA and CRMC created to operate the County's supposed home health agency. These acts as further described in the foregoing paragraphs constitute a conspiracy among BAYADA and Cape May Defendants to violate the Federal False Claims Act.

217. The Government, unaware of the falsity of all such claims made or caused to be made by the Cape May Defendants, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

218. By reason of the Cape May Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

219. Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

## Count III
## (Against Cape May Defendants)
## New Jersey False Claims Act

**N.J. Stat. Ann. §§ 2A:32C-1, *et seq.***

220. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

221. Based on all of the facts previously alleged, including, in particular, those in Counts I and II, the Cape May Defendants have caused the submission of false claims to the New Jersey Medicaid program and possibly other Government Health Care Programs within New Jersey in violation of the NJFCA.

222. Pursuant to the NJFCA, the Cape May Defendants are thus liable to the State for statutorily defined damages and civil penalties. N.J. Stat. Ann. § 2A:32C-3.

**Count IV**
**(Against VNA Defendants and Cape May Defendants)**
**Federal False Claims Act – False Claims**

**31 U.S.C. § 3729(a)(1)(A) (2009)**

223. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

224. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

225. By and through the acts described above, the VNA Defendants and Cape May Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, the County submitted, and continues to submit, claims to Medicare and other Government Health Care Programs requesting payment for home health and hospice services provided to patients of CRMC. These claims were tainted, and thereby false because of illegal kickbacks which VNACJ provided to CRMC to induce CRMC to refer those patients to the joint venture that VNACJ and CRMC created to operate the County's supposed home health agency.

226. The Government, unaware of the falsity of all such claims made or caused to be made by VNA Defendants and Cape May Defendants, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

227. By reason of the VNA Defendants' and Cape May Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

228. Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

**Count V**
**(Against VNA Defendants and Cape May Defendants)**
**Federal False Claims Act – Conspiracy**

**31 U.S.C. § 3729(a)(1)(C) (2009)**

229. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

230. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

231. By and through the acts described above, the VNA Defendants and Cape May Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Specifically, the County submitted, and continues to submit, claims to Medicare and other Government Health Care Programs requesting payment for home health and hospice services provided to patients of CRMC. These claims were tainted, and thereby false because of illegal kickbacks which VNACJ provided to CRMC to induce CRMC to refer those patients to the joint venture that VNACJ and CRMC created to operate the County's supposed home health agency. These acts, as further described in the foregoing paragraphs, constitute a conspiracy among the VNA Defendants and Cape May Defendants who violate the Federal False Claims Act.

232. The Government, unaware of the falsity of all such claims made or caused to be made by the VNA Defendants and Cape May Defendants, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

233. By reason of the VNA Defendants' and Cape May Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

234. Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

**Count VI**
**(Against VNA Defendants and Cape May Defendants)**
**New Jersey False Claims Act**

**N.J. Stat. Ann. §§ 2A:32C-1, *et seq.***

235. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

236. Based on all of the facts previously alleged, the VNA Defendants and Cape May Defendants have caused the submission of false claims to the New Jersey Medicaid program and possibly other Government Health Care Programs within New Jersey in violation of the NJFCA.

237. Pursuant to the NJFCA, the VNA Defendants and Cape May Defendants are thus liable to the State for statutorily defined damages and civil penalties. N.J. Stat. Ann. § 2A:32C-3.

**Count VII**
**(Against MSV)**
**Federal False Claims Act – False Claims**

**31 U.S.C. § 3729(a)(1)(C) (2009)**

238. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

239. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

240. By and through the acts described above, MSV has knowingly presented or caused to be presented false or fraudulent claims for payment or approval. MSV entered the joint venture arrangement with BAYADA. BAYADA then submitted, and continues to submit, claims

to Medicare and other Government Health Care Programs, requesting payment for Home Health and Hospice services provided to patients referred by MUSC and serviced by the joint venture between MSV and BAYADA. Those claims are tainted, and thereby false, because of the illegal kickbacks that BAYADA provided to MSV to induce MUSC to refer patients to the BAYADA-MSV joint venture.

241. The Government, unaware of the falsity of all such claims made or caused to be made by MSV, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

242. By reason of MSV's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

243. Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

**Count VIII**
**(Against MSV)**
**Federal False Claims Act – Conspiracy**

**31 U.S.C. § 3729(a)(1)(C) (2009)**

244. Relator realleges and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

245. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

246. By and through the acts described above, MSV has knowingly presented or caused to be presented false or fraudulent claims for payment or approval. MSV entered the joint venture arrangement with BAYADA. BAYADA then submitted, and continues to submit, claims to Medicare and other Government Health Care Programs, requesting payment for Home Health and Hospice services provided to patients referred by MUSC and serviced by the joint venture

between MSV and BAYADA. Those claims are tainted, and thereby false, because of the illegal kickbacks that BAYADA provided to MSV to induce MUSC to refer patients to the BAYADA-MSV joint venture.

247. The Government, unaware of the falsity of all such claims made or caused to be made by MSV, has paid and continues to pay such false or fraudulent claims that would not, and could not, have been paid if the Government knew the truth.

248. MSV's acts described above in collaboration with MUSC and BAYADA constitute a conspiracy to violate the Federal False Claims Act. As a result of that conspiracy, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

249. Additionally, the United States is entitled to treble damages and the maximum statutory penalty for each and every violation alleged herein.

## CLAIMS ON BEHALF OF THE RELATOR PERSONALLY

### Count IX
### Retaliation in Violation of False Claims Act

### 31 U.S.C. § 3730(h) 2009
### Defendant BAYADA

250. Relator realleges and incorporates by reference the allegations of the foregoing paragraphs as though fully set forth herein.

251. Relator served as BAYADA's full-time Director of Strategic Growth from January 2009 until he was discharged on August 22, 2016.

252. Defendant BAYADA harassed, discriminated against, threatened, and ultimately discharged Relator because of lawful acts Relator undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendant BAYADA's retaliation also independently violates the FCA, 31 U.S.C. § 3730(h).

253. Defendant BAYADA's retaliation and discrimination have inflicted damages on Relator including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

254. By reason of Defendant BAYADA's acts, it is liable to Relator for reinstatement with the same seniority status Relator would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for special damage sustained as a result of the discrimination, and attorney's fees and costs.

**Count X**
**Violation of The New Jersey Conscientious Employee Protection Act**

**N.J. Stat. §§ 34:19-1 to 34:19-8**
**Defendants BAYADA and David Baiada**

255. Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

256. The New Jersey Conscientious Employee Protection Act prohibits employers from taking adverse action against a whistleblower who discloses or objects to activities that the whistleblower reasonably believes: are criminal, fraudulent, or violate any law or regulation. N.J. Stat. Ann. § 34:19-3.

257. The statute applies to "any individual who performs services for and under the control and direction of an employer for wages or other remuneration," and includes by its plain terms independent contractors. *Id.* at § 34:19-2(b); *see also D'Annunzio v. Prudential Ins. Co. of America*, 927 A.2d 113, 119, 122 (N.J. 2007).

258. By and through the acts described above, Defendants BAYADA and David Baiada retaliated against Relator in violation of the New Jersey Conscientious Employee

Protection Act. Defendants terminated Relator in retaliation for disclosing and objecting to criminal, fraudulent and otherwise illegal acts, including, but not limited to, financial fraud, New Jersey public bidding fraud and violations of the AKS and Medicare regulations.

259. Relator performed services for and under the control and direction of BAYADA and David Baiada for wages and other remuneration and therefore qualifies for protection under the terms of the statute.

260. The statute provides that the court shall order, "where appropriate and to the fullest extent possible":

a. An injunction to restrain any violation of this act which is continuing at the time that the court issues its order;

b. The reinstatement of the employee to the same position held before the retaliatory action, or to an equivalent position;

c. The reinstatement of full fringe benefits and seniority rights;

d. The compensation for all lost wages, benefits and other remuneration; and

e. The payment by the employer of reasonable costs, and attorney's fees.

N.J. Stat. Ann. § 34:19-5. In addition, the court or jury may order punitive damages. *Id.*

261. Defendants BAYADA and David Baiada are thus liable to Relator to reinstate Relator in the same position held before the retaliatory action, or an equivalent position, to full fringe benefits and seniority rights, lost wages, benefits and other remuneration, and the payment of reasonable costs and attorney's fees. *Id.*

262. Defendants BAYADA's and David Baiada's actions were knowing, malicious, willful, and with conscious disregard for Relator's rights under the law. BAYADA upper management was directly involved in the retaliatory conduct, including - profit-sharing participants financially incentivized to do any deal that could result in revenue growth and profit -

Greg Bellomy, Chief Strategic Growth Officer, Michael Johnson, Practice Leader, and David Baiada, COO/CEO.

263. David Baiada was directly involved in the pattern of antagonism against Relator that followed on the heels of his CEPA-protected whistleblowing activity, and in his termination, as set forth above, including by discharging Relator on June 9, 2016. Mr. Baiada had not been Plaintiff-Relator's direct supervisor since November 30, 2015, but it was Mr. Baiada who called to terminate Plaintiff-Relator on June 9, 2016, thereby showing that Mr. Baiada retained authority over Plaintiff-Relator after November 30, 2015. Relator is further entitled to punitive damages in an amount to be determined at trial.

**Count XI**
**Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

**Defendant BAYADA**

264. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

265. In exchange for Relator's good faith performance of his work responsibilities for BAYADA in compliance with applicable law, BAYADA agreed to pay Relator agreed upon compensation.

266. BAYADA's "Standards of Honesty & Confidentiality," which is BAYADA's compliance policy (the "BAYADA Compliance Policy") sets forth the company's compliance obligation and expectation for its employees/contractors, and the employees/contractors' reasonable expectation of non-retaliation for engaging in lawful conduct. Those Standards specifically banned remuneration for referrals and interpreted BAYADA's obligations under the federal AKS broadly: "BAYADA employees must avoid any conduct that violates, or appears to violate, the federal or state anti-kickback statutes." The document also

promises that "BAYADA does not retaliate against employees for reporting honestly and confidentially violations or concerns about safety or quality of care. In fact, it is part of the employees' responsibilities to uphold our values and report instances when they suspect the law or our policies and procedures are being broken." Relator was in equal part expected to abide by and was protected by these standards of conduct.

267. BAYADA's Compliance Policy was widely distributed to all employees who were annually trained and attested and agreed to "embrace honesty, integrity … in all my interactions".

268. BAYADA's Compliance Policy does not contain a clear and prominent disclaimer that it is not a contract.

269. All employees were expected to comply with BAYADA's Compliance Policy. In fact, all employees, including Relator, were required to sign a "Honesty and Confidentiality Agreement" in connection with the Compliance Policy agreeing, upon threat of termination, to comply with the policy.

270. BAYADA'S Compliance Policy was a valid, enforceable contract between Relator and BAYADA.

271. In a June 2012 article published in CARING Magazine and co-authored by J. Mark Baiada, the company's position is clearly and publicly stated: "At BAYADA, we view compliance as a moral issue. As providers of home health care services to the elderly and those experiencing disability or illness, we will not compromise our moral, ethical or legal obligations."

272. Defendant BAYADA breached its contract with Relator, i.e., BAYADA's Compliance Policy, and its corresponding implied covenant of good faith and fair dealing, by

retaliating against Relator for attempting to stop BAYADA and the Cape May Defendants and MUSC Defendants' illegal schemes in the Cape May County and MUSC transactions.

273. As a result of Defendant BAYADA's breach of contract and the implied covenant of good faith and fair dealing, Relator has suffered damages including, but not limited to, termination benefits, lost past and future earnings, lost benefits, job-search expenses, humiliation, embarrassment, mental anguish, and emotional distress—in an amount to be determined specifically at trial.

274. Defendant BAYADA's conduct was performed knowingly, maliciously, oppressively, and with conscious disregard for both Relator's rights and state and federal law. Relator is entitled to exemplary and punitive damages against Defendant BAYADA in an amount to be determined at trial.

## Count XII
## Unjust Enrichment/ Quantum Meruit

### Defendant BAYADA

275. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

276. In 2009, Relator was incentivized by Bayada Nurses and Mark Baiada to identify and arrange the acquisition by BAYADA of home health agencies in North Carolina. In return, he promised to pay him a $60,000.00 "success fee" per agency acquired.

277. Relator worked strategically and invested long hours to identify agencies that would fit BAYADA's needs, approached such agencies, and followed up with persistence and determination.

278. On December 31, 2009, Mr. Freedman delivered to BAYADA one Cabarrus County home health agency in North Carolina (along with its one CON, one license, and one provider number). As agreed, BAYADA paid Relator a $60,000.00 success fee.

279. On June 11, 2012, BAYADA purchased another seven North Carolina home health agencies (and their corresponding certificates of need, licenses and provider numbers and all of their assets and office leases and ongoing business operations) that had been identified, sourced, brought to the table, and closed by Relator through years of work pursuant to his 2009 agreement with Bayada Nurses and Mark Baiada. However, after the closing, BAYADA paid him only one $60,000.00 success fee instead of the seven success fees (one per agency, for a total of $420,000.00) to which he was entitled. This was a unilateral decision by BAYADA with which Relator expressed his disagreement.

280. In particular, through an Asset Purchase Agreement dated April 16, 2012, five entities who owned and operated seven Medicare/Medicaid certified home health agencies in Gaston, Guilford, Forsyth, Davidson, Mecklenburg, Person and Rowan Counties, North Carolina, agreed to convey, transfer and sell, and Defendant BAYADA agreed to buy, all the business, assets, goodwill and rights of the Sellers used in connection with or otherwise related to the seven agencies. The purchase was consummated through a Bill of Sale and Assignment and Assumption Agreement between Defendant Bayada Home Health Care, Inc. and the five entities/Sellers who owned the seven home health agencies on June 11, 2012. The Sellers were: Mecklenburg Home Health, Inc., Home Health Professionals of Forsyth, Inc., Person Home Health, Inc., Home Health Professionals of Guilford, Inc., and Davidson Home Health, Inc.

281. Relator's efforts enriched Defendant BAYADA and it received a substantial benefit from its purchase of these assets and home health agencies. By failing and refusing to pay

Relator a success fee for each home health agency so acquired, Defendant BAYADA breached its promise and has been and continues to be unjustly enriched. Certificates of Need had been trading at prices from $1-$3 million each. Relator through persistence, determination and negotiating skill was able to acquire them for BAYADA for $578,571 each on average. Relator was fraudulently induced by BAYADA to confer these benefits and BAYADA is unjustly enriched by Relator's successful efforts. In 2012 alone, the seven counties where these seven home health agencies were located and licensed had a total of $110 million in Medicare home health reimbursements. As a result of Defendant BAYADA's actions, Relator has been damaged, and is entitled to recover all appropriate compensation, including without limitation, additional success fees totaling $360,000.00 plus prejudgment interest.

**Count XIII**
**Promissory Estoppel/Quantum Meruit**

**Defendant BAYADA**

282. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

283. Defendant BAYADA made a clear and definite promise to Relator with the expectation that he would rely on that promise, Relator did in fact reasonably rely on that promise and produce results, and in reliance on that promise and because of BAYADA's breach of that promise, Relator suffered detriment in the form of $360,000.00 in success fees that were not paid to him as earned and owed.

## IX. PRAYERS FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A. That the FCA Defendants are enjoined from violating the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and the New Jersey FCA;

B. That judgment be entered against the FCA Defendants and in favor of the United States and the Relator in an amount equal to three times the amount of damages caused by the FCA Defendants' misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount;

C. That judgment be entered against the Cape May Defendants and the VNA Defendants, and in favor of the State of New Jersey, and the Relator in the amount of the damages sustained by New Jersey multiplied as provided for in the New Jersey FCA, plus civil penalties in the ranges provided by the New Jersey FCA;

D. That the FCA Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

E. That judgment be granted for Relator against the FCA Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees permitted under 31 U.S.C. § 3730(d) and/or comparable provisions of the New Jersey FCA;

F. That Relator be awarded the maximum amount permitted under 31 U.S.C. § 3730(d), and comparable provisions of the New Jersey FCA;

G. That the Relator be awarded all relief appropriate under his personal claims for retaliation in violation of federal, and New Jersey law, including, without limitation, reinstatement, two times the amount of back pay, prejudgment interest on the back pay, and compensation for damages to his professional standing and consulting business sustained as a result of his termination, including litigation costs and reasonable attorneys' fees and costs, compensatory damages including for emotional distress, and punitive damages;

H. That the Relator be awarded all relief appropriate under his personal claims for unjust enrichment, promissory estoppel, and quantum meruit, including without limitation, his earned "success fees" of $360,000.00 plus prejudgment interest; and

I. That the Court award such other relief as the Court deems proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Relator requests a jury trial.

Dated: May 8, 2024

Respectfully submitted,

MCMORAN, O'CONNOR, & BRAMLEY,
& BURNS, P.C.

*/s/ Douglas Bramley*
Douglas S. Bramley, Esq.
Ramshorn Executive Center
Bldg. D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
Tel: (732) 223-7711
dbramley@mcmoranlaw.com

CARTUSCIELLO & KOZACHEK LLC

*/s/ Neil S. Cartusciello*
Neil S. Cartusciello (NSC-2460)
101 Farnsworth Avenue
Bordentown, NJ 08505
Tel: (609) 324-8200
Fax: (609) 324-8201
n.cartusciello@cclawllc.com

David J. Chizewer (admitted *pro hac vice*)
David E. Morrison (admitted *pro hac vice*)
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60603

Tel: (312) 201-4000
Fax: (312) 863-7472
david.chizewer@goldbergkohn.com
david.morrison@goldbergkohn.com

Attorneys for Plaintiff-Relator,
David Freedman